IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 3:21-cr-98 (JBA) |
| v. | June 14, 2022 |
| TAJH WILEY, *et. al.* | |

## GOVERNMENT'S PRETRIAL MEMORANDUM

The Government respectfully submits this memorandum of law in connection with issues that may arise at the trial of the above-captioned matter, which is scheduled for jury selection on July 11, 2022.

This trial memorandum addresses certain evidentiary matters, including the admissibility of coconspirator statements; the admissibility of evidence of defendant Wiley's arrest and incarceration for cocaine possession in February 2021; the admissibility of recorded calls and the authenticity of transcripts of those calls; the admissibility of electronic evidence from cellular telephones; the anticipated testimony of a drug expert; and the admissibility of demonstrative and summary exhibits and testimony.

As the Government is anticipating issues which may arise at trial, it reserves its right to provide additional briefing and/or argument based upon the defendants' contentions and on other such issues as may arise prior to, or during, trial.

I.    Procedural History

On June 8, 2021, Tajh Wiley, Kenston Harry, Jevaughn Watson, Myron Brown, Sashery Feliz, Charles Richardson, Peter Munoz, and Destiny Wade were indicted by a federal grand jury with conspiracy to possess with intent to distribute and to distribute cocaine and marijuana, in violation of 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(C) and 841(b)(1)(D).

On June 9, 2021, Wiley, Harry, Watson, Richardson, Munoz, and Wade were all arrested and arraigned on the indictment. Feliz, who was arrested in New Jersey, was initially presented before a United States Magistrate Judge in the District of New Jersey. Feliz was later arraigned on the indictment on July 28, 2021. Brown, who was in state custody in Pennsylvania, was arraigned on the indictment on August 2, 2021 by video.

On October 20, 2021, a federal grand jury returned a superseding indictment against each of the defendants. The superseding indictment added charges against Wiley, Harry, Brown, and Wade. As to Wiley and Harry, the superseding indictment added charges of conspiracy to possess with intent to distribute 400 grams or more of fentanyl and 500 grams or more of cocaine, in

violation of 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(A), and 841(b)(1)(B). As to Wiley, the superseding indictment added a charge of substantive possession of cocaine base in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). As to Harry, the superseding indictment added three charges of substantive possession of 400 grams or more of fentanyl, 500 grams or more of cocaine and an unspecified quantity of marijuana in violation of 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(A), and 841(b)(1)(B). As to Watson, the charges between the indictment and superseding indictment remained unchanged.

Wiley and Watson have been detained since June 9, 2021. (Watson is detained due to a pending violation of supervised release on 3:16-cr-216 (RNC), though that violation stems from his arrest and indictment in this matter.) The remaining defendants were released with conditions.

On March 1, 2022, Richardson entered a guilty plea, and sentencing is scheduled for August 9, 2022. On April 5, 2022, Munoz entered a guilty plea, and sentencing is scheduled for July 7, 2022. On April 28, 2022, Wade entered a guilty plea, and sentencing is scheduled for July 25, 2022. On April 29, 2022, Feliz entered a guilty plea, and sentencing is scheduled for July 26, 2022. On May 5, 2022, Brown entered a guilty plea, and sentencing is set for July 27, 2022.

Based upon representations made by counsel, Wiley, Harry, and Watson are expected to proceed to trial.

Jury selection is scheduled for July 11, 2022, at 9:00 a.m.

II.   <u>Nature of the Case</u>

The case arises from a Drug Enforcement Administration ("DEA") wiretap investigation of the Wiley drug trafficking organization. Pursuant to court authorization, investigators intercepted wire and electronic communications to and from a cellular telephone (the "Target Telephone") used by Tajh Wiley between approximately April 16, 2021, and June 9, 2021.

The Wiley drug trafficking organization distributed marijuana, cocaine, and fentanyl during the period of the charged conspiracy, January 2020 through June 9, 2021. Wiley, using the Target Telephone, communicated with his coconspirators, including Harry, Watson, Brown, Feliz, Richardson, Munoz, and Wade, in furtherance of the drug conspiracy.

On June 9, 2021, Wiley was arrested in Norwalk, Connecticut while in possession of the Target Telephone. Wiley also possessed a quantity of crack cocaine found in his vehicle.

On June 9, 2021, Harry was arrested in Hartford, Connecticut. DEA investigators searched Harry's Bloomfield, Connecticut residence and Hartford, Connecticut business (the Action Audio Store). Harry was in possession of a cellular telephone that he used to communicate with Wiley and the Target Telephone. The search of Harry's Bloomfield residence resulted in the seizure of over one kilogram of fentanyl, over one kilogram of cocaine, dilutants, kilogram presses, packaging materials and tools, marijuana, a firearm and personal items belonging to Harry, among

other items. The search of Harry's Hartford business resulted in the seizure of marijuana, scales, and firearms, among other items.

Watson was arrested on June 9, 2021. Watson possessed a cellular telephone that he used to communicate with Wiley and the Target Telephone. Evidence will show, including intercepted wire and electronic communications with Wiley using the Target Telephone, that Watson was involved in the distribution of cocaine and marijuana and, on May 7, 2021, received 300 grams of cocaine from Wiley during a drug transaction that occurred in Bridgeport, Connecticut.

The Government also expects to present evidence of Wiley's arrest on February 10, 2021, in Yonkers, New York, where Yonkers Police Officers recovered more than 400 grams of cocaine in Wiley's possession following a motor vehicle stop. (New York State charges are currently pending.) Wiley made videorecorded statements to the Yonkers Police Department, including statements about his involvement in marijuana and cocaine trafficking. While incarcerated, Wiley, in telephone calls recorded by the Westchester County Jail, communicated with coconspirators, including Harry and Wade, to acquire the Target Telephone to continue drug trafficking with his coconspirators.

III.    Anticipated Evidence

The Government anticipates approximately 12-15 trial days to present its case-in-chief, depending on the length of cross-examinations, although the length of evidence could be reduced based upon the entering of stipulations by the defendants. At present, the Government expects to call approximately 25 witnesses, including, but not limited to: (a) nine federal agents who participated in the investigation, including the case agent Special Agent Andrew Hoffman; (b) representatives from T-Mobile and the DEA related to the implementation and use of the Title III wiretap; (c) three law enforcement witnesses related to the extraction of data from cellular telephones and cell-site analysis; (d) five forensic chemists who analyzed controlled substances; (e) two law enforcement witnesses from the Yonkers Police Department; (f) one representative from the Westchester County Jail; and (g) various representatives from business and government entities, should they be needed, to authenticate business records. The Government also expects to introduce approximately 80 intercepted communications, primarily voice recordings, that were intercepted from the Target Telephone, and data lawfully extracted from four cellular telephones used by Wiley, Harry, and Watson. Of course, the Government does not know whether any of the defendants intend to put on a defense, which would add additional trial days to the case.

The following provides a summary of certain evidence the Government will seek to admit at trial and the basis for admission of that evidence.

The evidence to be presented as part of the Government's case includes drug evidence and other items of evidentiary value seized from locations in Connecticut and New York; intercepted wire and electronic communications occurring to and from the Target Telephone; phone extractions from cellular telephones possessed by Wiley, Harry, and Watson, including text

messages and voice recordings to and from the defendants and other coconspirators; cellular site location information related to cellular telephones possessed by Wiley, Harry, and Watson; recorded calls made from the Westchester County Jail involving Wiley, Harry, Wade, and another unindicted coconspirator; a video recorded statement made by Wiley to the Yonkers Police Department; publicly accessible YouTube video recordings depicting Wiley singing about the drug trade; video evidence from a pole camera positioned outside of Harry's Hartford, Connecticut business; a video recording of Wiley depositing funds at a Bank of America; video recordings created by the DEA during relevant surveillance of Wiley and Harry; business records from various entities (banks, mobile payment services, Foxwoods casino, and other places of business); business records from an Instagram social media account held by Wiley; and miscellaneous other evidence. Given the volume of certain records, the Government also intends to present summaries of this evidence (*e.g.*, summaries of voluminous Bank of America records, mapping of voluminous cellular site data). In addition, the Government expects to call experts in the field of narcotics investigations, analysis of cellular site data, analysis of controlled substances, extraction of data from cellular telephones, analysis of bank records, and valuation of jewelry.

On June 8, 2022, Government counsel provided to defense counsel proposed stipulations relating to the following: (1) the testimony of five forensic chemists as to the analysis of controlled substance exhibits; (2) the testimony of two examiners who extracted data from four cellular telephones searched pursuant to court-issued warrants; (3) a stipulation related to universal coordinated time; (4) testimony related to a May 7, 2021 vehicle stop and identification of Jevaughn Watson; (5) the admissibility and authenticity of phone calls made by Wiley and his coconspirators from the Westchester County Jail and the transcripts of such calls; and (6) the admissibility of video evidence from YouTube. Government counsel is also preparing and will soon present to defense counsel additional proposed stipulations relating to the following: (1) the admissibility of various business and public records, (2) the admissibility of pole camera video footage, and (3) the admissibility and authenticity of electronic and wire communications occurring to and from the Target Telephone and the transcripts of such calls.

IV.    <u>Pending Motions</u>

As of June 13, 2022, there are no pending motions before the Court.

The Government intends to file a motion *in limine* requiring that the defendants identify any proposed objections to excerpted wire communications, excerpted Westchester County jail telephone recordings, and excerpted pole camera footage pursuant to Fed. Rule. Ev. 106 (the rule of completeness), or any other writing or recorded statement or any other part, that the defendants intend to seek be admitted "that in fairness ought to be considered at the same time." Fed. Rule. Ev. 106. The Government is filing such a motion so that the parties can potentially agree on excerpts, or if needed seek pretrial admissibility rulings from the Court to avoid any unnecessary delay at trial, and also to ensure that other recordings or documents, or parts, sought by the defendant(s) are compatible with courtroom technology.

The Government intends to set forth in a motion *in limine*, as requested by the Court in its order dated June 10, 2022 (Doc. No. 375), the YouTube videos and excerpts that it seeks to offer at trial, as well as the purpose(s) for introducing them, in order to give the Court and defendant Wiley an opportunity to assess the admissibility of the videos. *See* Doc. No. 375, at 3.

If there is no agreement with the defendants on stipulations as to various business records, the Government intends to file a motion *in limine* for a pretrial ruling, under Fed. R. Evid. 803(6) and 902(11), as to the admissibly of various business records in an attempt to streamline the trial and prevent testimony of nearly a dozen representatives who would be required to do little more than authenticate business records.

V.    Coconspirator Statements

A.    Background

The evidence at trial will include recorded voice communications and text messages between Wiley, Harry and Watson, and between other identified and unidentified coconspirators. In addition, evidence at trial will include Wiley's February 2021 cocaine possession, and recorded communications that Wiley made to the Yonkers Police Department and from Westchester County Jail during the pendency of the conspiracy charged in the superseding indictment. Trial evidence will also include text communications and voice communications saved to cellular telephones used by Wiley, Harry, and Watson. This evidence is admissible against the defendants as their own statements and the statements of their coconspirators.

It is well-settled that statements of coconspirators are admissible at trial as non-hearsay under Fed. R. Evid. 801(d)(2)(E), provided that the statements satisfy certain pre-requisites. It is equally well settled that the Court may admit such coconspirator statements on a conditional basis and subject to connection, prior to the Court's determination that the prerequisites for admissibility have been established. In the Second Circuit, district courts customarily make this determination which is commonly referred to as a *Geaney* ruling at the close of the Government's case-in-chief. *See United States v. Geaney*, 417 F.2d 1116, 1120 (2d Cir. 1969). The contours of the coconspirator-statements rule and pertinent facts from the case at bar are addressed herein.[1]

B.    Rule 801(d)(2)(E)

Pursuant to Federal Rule of Evidence 801(d)(2)(E), "[a] statement is not hearsay if . . . [t]he statement is offered against a party and it is a statement by a coconspirator of a party during the

---

[1] The defendants' own statements, made over a recorded line, extracted from phones, or made to witnesses, are admissible under Rule 801(d)(2)(A) of the Federal Rules of Evidence, if offered by the Government, as statements of a party opponent. Further, statements made by others to the defendant are also admissible as non-hearsay if they are admitted to provide context to the defendant's statements, or to show association. *See United States v. Barone*, 913 F.2d 46, 49 (2d Cir. 1990); *United States v. Walter*, 434 F.3d 30, 33-34 (1st Cir. 2006).

course and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). For a statement to be admissible as a coconspirator statement under Rule 801(d)(2)(E), the Court must find the following by a preponderance of evidence: (1) a conspiracy existed at the time of the statement; (2) both the declarant and the defendants against whom the statement is offered were members of that conspiracy; (3) the statement must have been made in furtherance of the conspiracy; and (4) the statement must have occurred during the course of the conspiracy. *See Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987) (enumerating four prerequisites for admissibility of coconspirator statements and establishing preponderance of evidence standard); *see also United States v. Coppola*, 671 F.3d 220, 246 (2d Cir. 2012); *United States v. Tellier*, 83 F.3d 578, 580 (2d Cir. 1996); *United States v. Tracy*, 12 F.3d 1186, 1196 (2d Cir. 1993).

The Supreme Court has held that in determining whether the requirements to admit a proposed coconspirator statement are met, courts may take into consideration the content of the coconspirator's statement itself. *Bourjaily v. United States*, 483 U.S. at 181. In 1997, Federal Rule of Evidence 801(d)(2)(E) was amended to respond to the issues raised by *Bourjaily* and codified the Supreme Court's holding by stating that a court shall consider the contents of a coconspirator's statement in determining "the existence of the conspiracy and the participation therein of the declarant and the party against whom statement is offered..." Fed. R. Evid. 801(d)(2)(E).

Although the *Bourjaily* Court declined to decide whether coconspirator statements alone suffice to establish the existence of a conspiracy, 483 U.S. at 181, Rule 801(d)(2)(E) states that the statement's contents are "not alone sufficient" to establish the existence of the conspiracy and the participation of the declarant and the defendant in the conspiracy. Rule 801(d)(2)(E). Thus, while the coconspirator statement itself may be considered in establishing the existence of the conspiracy, "there must be some independent corroborating evidence of the defendant's participation in the conspiracy," *United States v. Gigante*, 166 F.3d 75, 82 (2d Cir. 1999); *United States v. Tellier*, 83 F.3d at 580; *see also Coppola*, 671 F.3d at 247 ("A preponderance of the evidence, including the challenged out-of-court statements and independent corroborating evidence, easily established the existence of a racketeering conspiracy.").

1. <u>A Conspiracy Existed When the Coconspirator Statements Were Made</u>

Before using one coconspirator's statement against another in a criminal prosecution, the Court must find that a conspiracy existed when the statement was made. *See Bourjaily*, 483 U.S. at 175; *Tracy*, 12 F.3d at 1196; *Tellier*, 83 F.3d at 580; *United States v. Rivera*, 22 F.3d 430 at 435-36 (2d Cir. 1994). As indicated, the coconspirator statement itself may be considered in establishing the existence of the conspiracy. *Gigante*, 166 F.3d at 82; *Tellier*, 83 F.3d at 580.

This case involves a narcotics trafficking conspiracy spanning January 2020 to June 9, 2021. Wiley, Harry and Watson, along with other named and unnamed coconspirators, are alleged to have been participants in the conspiracy. Intercepted wire and electronic communications will span a period of time from approximately April 16, 2021 to June 9, 2021. Wiley's recorded

statement to the Yonkers Police Department and recorded jail calls occurred in February 2021. The evidence at trial will prove, by the requisite standard (preponderance of the evidence), that the conspiracy existed when the statements at issue in this case were made. As indicated above, the United States anticipates that the recorded conversations and text messages themselves will offer details about the nature and scope of the conspiracy and the roles of the members of the conspiracy. Further, there is abundant physical and documentary evidence that establishes the existence of the conspiracy.

2.    The Defendants and Declarants Were Members of the Charged Conspiracy

Second, the Court must find that the individual who made the statement, and the defendant against whom the statement is offered, were members of the conspiracy at the time of the statement. *See Bourjaily*, 483 U.S. at 175; *Tracy*, 12 F.3d at 1196; *Paredes*, 176 F. Supp. 2d at 186; *United States v. Lombardozzi*, 2003 WL 1956290, at *1 (S.D.N.Y. 2003); *United States v. Millan-Colon*, 836 F. Supp. 1007, 1015 (S.D.N.Y. 1993). The coconspirator statement shall be considered along with other evidence in deciding the question of the defendant's membership in the conspiracy. *See United States v. Cota*, 953 F.2d 753, 758 (2d Cir. 1992); *Tellier*, 83 F.3d at 580. In order to prove membership in the conspiracy, the other evidence need only show "a likelihood of an illicit association between the declarant and the defendant," *United States v. Ragland*, 375 F.2d 471, 477 (2d Cir. 1967); *see also United States v. Borelli*, 336 F.2d 376, 387 (2d Cir. 1964); *United States v. DeJesus*, 806 F.2d 31, 34 (2d Cir. 1986); *Lombardozzi*, 2003 WL 1956290, at *1; and the proof of the illicit association may be "totally circumstantial." *Ragland*, 375 F.2d at 477 (independent evidence includes acts of the accused occurring after the time the association is alleged to exist); *DeJesus*, 806 F.2d at 34.

This is especially true of drug conspiracies which often consist of "loose-knit combinations." *United States v. Bynum*, 485 F.2d 490, 495 (2d Cir. 1973). Due to the secretive nature of a drug conspiracy, its existence as well as a defendant's membership may be established entirely by circumstantial evidence. *United States v. Miranda-Ortiz*, 926 F.2d 172, 175-76 (2d Cir. 1991); *United States v. Labat*, 905 F.2d 18, 21 (2d Cir. 1990). The Government does not have to prove that "he knew all the members of the conspiracy or all the details of its operation . . . so long as it proves that the coconspirators agreed on the essential nature of the plan." *United States v. Miranda-Ortiz*, 926 F.2d at 175-76 (citations omitted). *See also Labat*, 905 F.2d at 21.

In this connection, "[o]nce a conspiracy is shown to exist, the evidence sufficient to link another defendant to it need not be overwhelming." *United States v. Reyes*, 302 F.3d 48, 53 (2d Cir. 2002); *United States v. Casamento*, 887 F.2d 1141, 1156 (2d Cir. 1989); *Cota*, 953 F.2d at 758. The Government must show two separate factors: (1) that the defendant intended to engage in the charged scheme; and (2) that the defendant had some knowledge of the unlawful aims of the conspiracy. *See Reyes*, 302 F.3d at 53. The defendant's "presence, together with evidence of other circumstances permitting an inference that he 'knew about the enterprise and intended to

participate in it or to make it succeed,' will support a finding of his membership in the conspiracy." *United States v. Bull*, 12 F. Appx. 64, 65 (2d Cir. 2001).

Finally, the Government need not show that the person who heard the declarant's statement was also a member of the conspiracy. *See United States v. Minicone*, 960 F.2d 1099, 1110 (2d Cir. 1992); *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1199 (2d Cir. 1989); *Lombardozzi*, 2003 WL 1956290 at \*2.

The evidence at trial will prove by the requisite standard (preponderance of the evidence) that each defendant – Wiley, Harry and Watson – was a member the charged conspiracy, and that coconspirators (both known and unknown) whose statements the Government seeks to admit were also members of the conspiracy. This evidence will include intercepted wire communications, evidence from seized cellular telephones including text message and voice memo communications, testimony from agents involved in the investigation, drugs seized during the course of the investigation, testimony of other witnesses, business records, and the explicit content of the coconspirator statements themselves.

### 3. The Coconspirator Statements Were Made in Furtherance of the Conspiracy

Third, the statement must have been made in furtherance of the conspiracy. *See Bourjaily*, 483 U.S. at 175; *Tracy*, 12 F.3d at 1196; *Tellier*, 83 F.3d at 580; *Rivera*, 22 F.3d at 435-36. The statement must be intended to prompt the listener to respond in a manner that promotes the goals of the conspiracy or facilitates the carrying out of the criminal activity. *See United States v. Maldonado-Rivera*, 922 F.2d 934, 958 (2d Cir. 1990); *see also United States v. Edwards*, 214 F. Appx. 57, 64 (2d Cir. 2007); *United States v. Rahme*, 813 F.2d 31, 35 (2d Cir. 1987); *Katsougrakis*, 715 F.2d 769, 778 (2d Cir. 1983); *Beech-Nut Nutrition Corp.*, 871 F.2d at 1199; *Millan-Colon*, 836 F. Supp. at 1016; *United States v. Persico*, 832 F.2d 705, 716 (2d Cir. 1987); *Lombardozzi*, 2003 WL 1956290 at \*1.

The Second Circuit has held that statements between coconspirators "that provide reassurance, or seek to induce a coconspirator's assistance, or serve to foster trust and cohesiveness, or inform each other as to the progress or status of the conspiracy" may be deemed "in furtherance of" the conspiracy. *Maldonado-Rivera*, 922 F.2d at 958-59; *Rahme*, 813 F.2d at 35-36; *United States v. Salerno*, 868 F.2d 524, 535-36 (2d Cir. 1989); *Tracy*, 12 F.3d at 1196; *United States v. Paone*, 782 F.2d 386, 391 (2d Cir. 1986); *Persico*, 832 F.2d at 716 (statements informing conspirator of the identity and activities of coconspirators are "in furtherance" of conspiracy); *United States v. Rastelli*, 870 F.2d 822, 837 (2d Cir. 1989) (concluding the same).

Similarly, statements designed to promote or facilitate achievement of the goals of the conspiracy by communicating with a person who is not a member of the conspiracy in a way that is designed to achieve the plan's goals are also considered to have been made "in furtherance of" the conspiracy. *See Rivera*, 22 F.3d at 436; *Beech-Nut Nutrition Corp.*, 871 F.2d at 1199; *Katsougrakis*, 715 F.2d at 778; *Paredes*, 176 F. Supp. 2d at 187. A trial court's determination that

a coconspirator statement is "in furtherance" of the conspiracy is a question of fact which will not be disturbed on appeal absent a finding that the determination was clearly erroneous. *Persico*, 832 F.2d at 716; *Rahme*, 813 F.2d at 36.

Testimony from law enforcement agents and witnesses, including the introduction of intercepted wire communications and evidence from seized cellular telephones, will define the approximate terms of the charged conspiracy in this case. This testimony, as well as the explicit nature of the coconspirator statements sought to be admitted, will prove by the requisite standard (preponderance of the evidence), that the coconspirator statements sought to be admitted by the United States were made in furtherance of the charged conspiracy.

Moreover, during his brief imprisonment in February 2021 in Westchester County, New York, Wiley engaged in recorded conversations with Harry, Wade, and another uncharged coconspirator, Jammal Gant, in which Wiley sought to obtain a cellular telephone—ultimately, the Target Telephone that was used in furtherance of the drug trafficking conspiracy. Wiley also provided instructions to his coconspirators in furtherance of drug trafficking. *See United States v. Hempstead*, 2017 WL 401938 (D. Conn. Jan. 30, 2017) (VAB) (coconspirator discussions about bond issues and other matters post-arrest were in furtherance of the conspiracy); *United States v. Paredes*, 176 F. Supp.2d 183, 189-91 (S.D.N.Y. 2001) (same).

4.     <u>The Statements Were Made During the Course of the Charged Conspiracy</u>

Fourth, the coconspirator statements must be made during the course of the conspiracy. *See Bourjaily*, 483 U.S. at 175; *Rivera*, 22 F.3d at 435-36; *Tracy*, 12 F.3d at 1196; *Lombardozzi*, 2003 WL 1956290, at *1. Statements made during the course of the conspiracy include statements made by a coconspirator before the completion of the criminal object of the conspiracy. *See Haywood v. Portuando*, 2003 WL 1563770, at *22 (S.D.N.Y. 2003) (statements are made during the course of the conspiracy if made prior to the realization of overall goal). Generally, a statement is not made during the course of the conspiracy when it is made after the main objective of the conspiracy has been accomplished. *See Lombardozzi*, 2003 WL 1956290, at *1. However, where particular crimes have already been committed, "the conspiracy does not necessarily end; it continues until its aim has been achieved, it has been abandoned, or otherwise terminated." *United States v. Arrington*, 867 F.2d 122, 130 (2nd Cir. 1989). Absent affirmative evidence of withdrawal from the conspiracy, a conspirator's participation "is presumed to continue until the last overt act by any of the conspirators." *United States v. Greenfield*, 44 F.3d 1141, 1150 (2d Cir. 1995). Additionally, events occurring after the statement may be used to show that the statement was made during the course of a conspiracy. *Casamento*, 887 F.2d at 1171.

The evidence at trial, including the testimony referenced above, intercepted wire communications and stored communications, the drugs seized in this case, and evidence of the various financial transactions that took place, will prove by the requisite standard (preponderance

of the evidence), that the coconspirator statements here at issue were made during the course of the charged conspiracy (which was ultimately disrupted by law enforcement on June 9, 2021).

VI.     Evidence of Wiley's Possession of Cocaine in Yonkers, New York in February 2021, and Subsequent Recorded Jail Calls from Westchester County Jail

Evidence of Wiley's possession of more than 400 grams of cocaine in Yonkers, New York in February 2021 – during the pendency of the conspiracy – is direct evidence of Wiley's role in the drug trafficking conspiracy during the pendency of the charged conspiracy. Recorded jail phone calls also provide direct evidence of the existence of the drug conspiracy, including communications between Wiley, Harry and other co-conspirators where Wiley sought to acquire a new cellular telephone in furtherance of drug trafficking. The Yonkers incident is also inextricably intertwined with the development of wiretap of the Target Telephone, which began in April 2021. It is well settled in the Second Circuit that "evidence of uncharged criminal activity is not considered other crimes evidence under Fed. R. Evid. 404(b) if it . . . is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." *See United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) (quoting *United States v. Gonzalez*, 110 F.3d 936 (2d Cir. 1997)). Where uncharged crimes constitute important proof of any element of the act charged, evidence of the uncharged crime does not fall within a Rule 404(b) analysis. *See United States v. Quinones*, 511 F.3d 289, 308-09 (2d Cir. 2007) (defendant's uncharged death threats to two informants against him were "admissible without reference to Rule 404(b)" in his trial for the murder of another informant against him). In describing the test to determine if alleged other acts evidence is actually intrinsic to the charged crime, the Seventh Circuit has instructed:

> Acts satisfy the inextricably intertwined doctrine if they complete the story of the crime on trial; their absence would create a chronological or conceptual void in the story of the crime; or they are so blended or connected that they incidentally involve, explain the circumstances surrounding, or tend to prove any element of the charged crime.

*United States v. Senffner*, 280 F.3d 755, 764 (7th Cir. 2002); *accord United States v. Weeks*, 716 F.2d 830, 832 (11th Cir. 1983) (in trial for assaulting federal officer, the agent's "investigation into stolen vehicles explained the agent's presence with Weeks and his associates, and their animosity towards the agent. The investigation was inextricably linked to the charged offense of assault, was reasonably necessary to complete the story of the crime, and therefore was not extrinsic under Rule 404(b)").[2]

---

[2]    Evidence that is inextricably intertwined with charged conduct must nonetheless satisfy the balancing test promulgated in Fed. R. Evid. 403. *See United States v. Graziano*, 558 F. Supp. 304,

Here, Wiley's possession of cocaine in Yonkers, New York took place during and in furtherance of the charged drug trafficking conspiracy. Even if viewed as distinct from the Connecticut conspiracy and the later use of the wiretap over the Target Telephone, the Yonkers cocaine possession is inextricably intertwined with the charged conspiracy. The evidence demonstrates the extent of Wiley's role in the conspiracy and in his videorecorded statement to the Yonkers Police Department, Wiley admits his involvement in the distribution of marijuana and cocaine.[3] After his arrest by the Yonkers Police Department, Wiley was briefly incarcerated. While incarcerated, he engaged in recorded jail communications with Harry, Wade, and other coconspirators where he sought to acquire a new cellular telephone for continued drug trafficking (as his prior cellular telephones were seized by the Yonkers Police Department as evidence). The Government believes that Harry then acquired for Wiley the Target Telephone, which eventually was subject to court-authorized interception. Wiley, Harry, and Wade also discussed the circumstances of Wiley's arrest, providing context to their roles as members of the drug conspiracy.

Evidence of Wiley's cocaine possession cannot be considered "other acts" evidence. Indeed, in a factually similar case, *United States v. Aleman*, the Fifth Circuit rejected the defendant's argument that evidence of a single cocaine sale should not have been admitted in the defendant's heroin conspiracy trial. 592 F.2d 881 (5th Cir. 1979). The Fifth Circuit reasoned:

> In the usual case, the "other acts" occurred at different times and under different circumstances from the crime charged. The policies underlying the rule are simply inapplicable when some offenses committed in a single criminal episode become "other acts" because the defendant is indicted for less than all of his actions. If a person breaks into a house, murders the occupants, and steals a television set, the individual offenses do not become "wholly separate and independent crimes" merely because they are made the subjects of separate indictments.

*Id.* at 885. The same holds true in this case. Wiley traveled to New York as part of the drug distribution conspiracy. While incarcerated in Westchester County, Wiley sought to acquire a cellular telephone to further his drug trafficking. Wiley also discussed his drug trafficking with his coconspirators. Failing to provide the jury with the context by which Wiley acquired the Target

---

320 (E.D.N.Y. 2008) (applying Rule 403 balancing test to evidence deemed inextricably intertwined).

[3] Wiley admits that this evidence is admissible in the Government's case-in-chief. In his Third Motion to Suppress, Wiley states: "In February 2021, Mr. Wiley was arrested by Yonkers, NY police and during his detention, admitted to distributing marijuana. While it's true that the defendant minimizes the extent of his drug dealing during the police interview, prosecutors have this admission as evidence as the defendant's trial." Doc. No. 302, at 8 (citation omitted).

Telephone or ignoring a drug transaction during the time period of the charged conspiracy would "detract from the search for the truth." *Id.*

Even if the evidence of Wiley's cocaine possession was not inextricably intertwined with the charged conspiracy, despite it being during the period of time of the charged conspiracy, it is properly admitted pursuant to Fed. R. Evid. 404(b) to prove intent to distribute and knowledge of the conspiracy as to Wiley and Harry. The government is required to prove that Wiley and Harry knowingly or intentionally conspired to distribute controlled substances, including cocaine, or to possess it with intent to distribute controlled substances. Where intent is at issue "evidence of [his] involvement in prior narcotics transaction was probative of [his] intent or knowledge in connection with the crime charged." *United States v. Pitre*, 960 F.2d 1112, 1119 (2d Cir. 1992) (citing *United States v. Caputo*, 808 F.2d 963, 968 (2d Cir. 1987)). Of course, the New York cocaine possession was not prior to the charged crime, but rather falls within the ambit of the charged conspiracy. Wiley admitted to the Yonkers Police Department that the cocaine was destined for Connecticut. Accordingly, the probative value of the evidence as to Wiley's knowledge and intent at the time of the charged crime is quite high, and also probative to Harry's knowledge and intent as a member of the charged drug conspiracy.

Evidence of Wiley's acquisition of the Target Telephone is important background evidence – and thus direct evidence – of the crimes charged. It is therefore admissible in the case. This evidence also goes to Harry's knowledge and participation in the drug conspiracy, particularly where, based upon recorded jail calls, he was aware that Wiley had been arrested for cocaine possession. Even if such evidence were considered "other acts" evidence, it would be admissible. Courts have allowed the introduction of such evidence in cases with similar circumstances. *See United States v. Sitzmann,* 856 F.Supp.2d 55 (D.D.C. 2012) (conversations in jail between associates who would soon be conspirators was admissible as direct evidence of crime charged, and evidence of crimes that put them in jail were admissible under Rule 404(b)); *United States v. Gray,* 292 F.Supp.2d 71 (D.D.C. 2003) (evidence of defendants' time in prison together admissible to show the background of the charged conspiracy and the development of close relationships between key persons in the criminal enterprise); *United States v. Pitre,* 960 F. 2d 111 (2d Cir. 1992) (affirming introduction of prior drug relationship between defendant and coconspirators as it helped establish the background of the charged crimes, the relationship of trust between the conspirators, and the defendant's state of mind). "It is proper to include evidence of prior bad acts in conspiracy cases if they explain the background, formation, and development of the illegal relationship and, more specifically, to help the jury understand the basis for the coconspirators' relationship of mutual trust." *United States v. Santana,* 342 F.3d 60, 67 (1st Cir. 2003) (quotation omitted) (affirming admission of evidence of prior cocaine conspiracy in prosecution for conspiracy to distribute and possess with intent to distribute cocaine); *see United States v. Vega,* 285 F.3d 256, 261 (3d Cir.2002) (affirming admission of evidence of prior drug conspiracy offered in part to demonstrate defend]ant's relationship with member of the charged conspiracy); *United States v. Pascarella,* 84 F.3d 61, 72–73 (2d Cir.1996) (affirming admission of evidence of

defendant's past illegal dealings with coconspirators "to enable the government to establish the basis of a trust relationship" among them).

Although the Government believes that Wiley's cocaine possession falls within the ambit of the charged drug conspiracy, whether it is direct evidence inextricably intertwined with the charged conspiracy or extrinsic proof, it can only be admitted if the evidence satisfies the requirements of Fed. R. Evid. 403, which provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Of course, Fed. R. Evid. 403 "establishes a presumption in favor of the admissibility of relevant evidence." *United States v. Seals*, 419 F.3d 600, 612 (7th Cir. 2005)*; see also United States v. Morris*, 79 F.3d 409, 412 (5th Cir. 1996) ("Because Rule 403 requires the exclusion of relevant evidence, it is an extraordinary measure that should be used sparingly."); *United States v. Naranjo*, 710 F.2d 1465, 1469 (10th Cir. 1983) ("Unless trials are to be conducted on scenarios, on unreal facts tailored and sanitized for the occasion, the application of Rule 403 must be cautious and sparing."). Under a Rule 403 analysis, evidence should not be excluded unless it is *unfairly* prejudicial. *See United States v. Gartmon*, 146 F.3d 1015, 1021 (D.C. Cir. 1998) ("Rule 403 does not generally require the government to sanitize its case, to deflate its witnesses' testimony, or to tell its story in a monotone."); *cf. United States v. Centracchio*, 265 F.3d 518, 531-32 (7th Cir. 2001) (probative evidence is always prejudicial in the literal sense of making a defendant look guilty). Probative value is not outweighed by prejudicial effect when the prior similar bad acts do not "involve conduct more inflammatory than the charged crime," *United States v. Paulino*, 445 F.3d 211, 223 (2d Cir. 2006) (quoting *United States v. Livoti*, 196 F.3d 322, 326 (2d Cir. 1999)).

In this case, Wiley's possession of cocaine in Yonkers, New York is hardly more inflammatory than his distribution of fentanyl, cocaine, and marijuana in Connecticut throughout the charged conspiracy, and his possession of crack cocaine upon his arrest in June 2021. While evidence that Wiley possessed cocaine in furtherance of the drug conspiracy certainly demonstrates the extent of participation by Wiley and Harry in the conspiracy, their knowledge of the conspiracy, and their contemporaneous intent to distribute narcotics, the unavoidable prejudice derived from introducing evidence of their crimes cannot be reason to exclude the evidence. *See United States v. McCarthy*, 97 F.3d 1562, 1573 (8th Cir. 1996) ("although the evidence was prejudicial to [the defendant,] as is most evidence offered against defendants, it was not unfairly prejudicial . . .").

VII.    Admissibility of Recorded Calls and Transcripts

A.    Introduction

The Government seeks to introduce wire and electronic communications intercepted occurring to and from the Target Telephone used by Wiley. The Government also seeks to

introduce excerpts of jail calls made by Wiley while incarcerated in Westchester County. Certain of the jail calls were between Wiley and Wade and Harry, all members of the drug conspiracy. The jail calls are made over a recorded line and the fact of the recording is made explicit to the callers. As discussed above, these conversations are admissible as statements of a coconspirator and/or as a statement of the defendant himself. *See United States v. Estevez,* 2017 WL 700775, at * 5 (S.D.N.Y. Feb. 16, 2017) (it is "well settled in the Second Circuit and beyond" that recorded prison calls are admissible as admissions of a party opponent); *United States v. Reed,* 576 F. App'x. 60, 61 (2d Cir. 2014) (summary order) (prison calls admissible as a statement of a party opponent under Federal Rule of Evidence 801(d)(2)(A)"); *United States v. Guang Ju Lin,* 505 F. App'x. 10,13 (2d Cir. 2012) (summary order) (same); *United States v. Russo,* 302 F.3d at 43 (2d Cir. 2002) (same); *United States v. Jones,* 716 F.3d 851, 855 (4th Cir. 2013) ("[The defendant] concedes that his statements on the [prison] phone calls were admissible under the party opponent exception to hearsay, *see* Fed. R. Evid. 801(d)(2)(A)...."). In addition, they are admissible where they are not necessarily offered for their truth but rather to show the association between Wiley, Wade, and Harry, and their knowledge, state of mind and intent relating to their jointly undertaken criminal activity.

Excerpts[4], rather than the entirety of the intercepted wire conversations and jail conversations, will be offered to avoid unnecessary delay at trial. Because the recordings and the transcripts contain coconspirator statements, the Government will seek to have them admitted on a conditional basis and subject to connection. Thereafter, the Government will present evidence that will establish the necessary foundational prerequisites for the admission of the coconspirators statements, including the testimony of witnesses and the recorded conversations themselves. The defendants' intercepted statements will be offered as the statements of a party-opponent under Federal Rule of Evidence 801(d)(2)(A).

---

[4] The Government requests, with respect to any excerpted wire communications, that any defense motions pursuant to Fed. R. Ev. 106 ("the rule of completeness") be made in advance of trial. The defendants have been provided with the intercepted wire communications and electronic communications that the Government intends to introduce at trial, including excerpted wire communications. Accompanying these recordings are draft transcripts of the content of the communication. The Government seeks to avoid any unnecessary delay at trial and cannot predict "any other part" of the recording or "any other writing or recorded statement" that the defendant may seek to introduce to be considered at the same time. Due to technological limitations in the courtroom and the technology employed (i.e., Trial Director software), those "other part(s)" could be difficult to display to the jury without prior notice. Moreover, the Government cannot prepare a transcript as a jury aid for an exhibit it cannot predict will be introduced. As such, the Government requests that any motions pursuant to Fed. R. Ev. 106 be made in advance of trial so that the writing or recorded statement that a defendant seeks to introduced can be properly marked, transcribed (if necessary), and compatible with courtroom technology.

B.    Authentication of Recordings

1.    Relevancy

In order to be relevant, and admissible, evidence must have a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401; *see also* Fed. R. Evid. 402. Authentication "represent[s] a special aspect of relevancy," Fed. R. Evid. 901(a), Advisory Committee's Notes, Note to Subdivision (a), because evidence cannot have a tendency to make the existence of a disputed fact more or less likely if the evidence is not that which its proponent claims. *See United States v. Sliker*, 751 F.2d 477, 499 (2d Cir. 1984) ("Authentication is perhaps the purest example of a rule respecting relevance."). Consequently, authentication is "a condition precedent to admitting evidence." Fed. R. Evid. 901(a); *see also Sliker*, 751 F.2d at 497.

2.    Authentication Standard in the Second Circuit

The Second Circuit has adopted a flexible, "general standard" governing the admissibility of sound recordings. *United States v. Hamilton*, 334 F. 3d 170, 186 (2d Cir. 2003). Recordings may be admitted in evidence if there is "clear and convincing evidence of authenticity and accuracy . . . sufficient to support a finding that the matter in question is what its proponent claims." *Id.* 334 F. 3d at 186 (citations omitted; internal quotation marks omitted); *see also* Fed. R. Evid. 901(a). It "has expressly and repeatedly declined to adopt . . . a rigid standard" because applying inflexible criteria to determine the admissibility of recordings would be unworkable. *Hamilton*, 334 F. 3d at 186 (citations omitted; internal quotation marks omitted).

District courts, therefore, are afforded "broad discretion" to determine whether recordings have been properly authenticated. *United States v. Tropeano*, 252 F. 3d 653, 661 (2d Cir. 2001); *United States v. Ruggiero*, 928 F. 2d 1289, 1303 (2d Cir. 1991). Rulings regarding the authentication and admission of recordings will not be reversed "absent an abuse of discretion." *Tropeano*, 252 F. 3d at 661; *see Ruggiero*, 928 F. 2d at 1303.

3.    Authentication of Jail Recordings

To authenticate a recording, "[t]he government is not required to call as a witness a participant in the recorded conversation." *United States v. Barone*, 913 F.2d 46, 49 (2d Cir. 1990); *see also Tropeano*, 252 F. 3d at 661. Nor is there a requirement that the recordings be authenticated through the testimony of a witness who overheard the recorded conversation, *i.e.* "a contemporaneous witness to the recorded conversation." *Fuentes*, 563 F.2d at 532.

The parties may be able to stipulate to the authenticity of the recorded conversations as they were provided by the Westchester County Jail pursuant to subpoena, the recordings themselves note that they were made over the recorded line, and documentation from Westchester County Jail shows, the numbers dialed, the dates and times of the calls, and the duration of the

call. This information has been provided to the defense. If there is no stipulation, the Government will call a representative from the Westchester County Jail to explain the procedure for recording the calls and the relevant documentation the facility maintains concerning each detainee's calls, and to testify about how the recorded calls were collected pursuant to a subpoena from the DEA. One of the DEA case agents who participated in the underlying investigation can testify about serving a subpoena for these calls and receiving the recordings in response. He can testify about how the recordings were maintained after they were received. He has listened to the calls and is able to identify the participants due to his overall participation in the investigation, the telephone numbers used, and his learned familiarity with the voices of Wiley, Wade, and Harry, derived from his exposure to the defendant listening to many recordings of phone conversations occurring to and from the Target Telephone and, later, in person listening to each person's voice on the dates of each person's arrest. Under applicable case law, a recording may be authenticated through voice identification – "[i]dentification of a voice, whether heard firsthand or through mechanical or electronic transmission or recording, by opinion based upon hearing the voice at any time under circumstances connecting it with the speaker" is sufficient to authenticate a recording. Fed. R. Evid. 901(b)(5); *United States v. Rommy*, 506 F.3d 108, 138 (2d Cir. 2007); *United States v. Rizzo*, 492 F.2d 443, 448 (2d Cir. 1974).

In this regard, the voices in a recorded conversations may, of course, be authenticated by someone who actually participated in the recorded conversation. *See Hamilton*, 334 F. 3d at 187; *Tropeano*, 252 F.2d at 661. Someone who has not participated in the conversation, like a case agent, who is familiar with a person's voice, may also authenticate a recorded conversation in which the defendant participated. *See Rommy*, 506 F.3d at 138. If a defendant testifies at trial, the jury itself can compare the defendant's voice with a voice on a recording for identification purposes. *See United States v. Sliker*, 751 F.2d 477, 500 (2d Cir. 1984). This is so because "expert qualification is not required for voice identification." *United States v. Chiarizio*, 525 F.2d 289, 296 (2d Cir. 1975); Fed. R. Evid. 901(b)(5), Advisory Committee Notes ("aural voice identification is not the subject of expert testimony").

    4.    <u>Authentication of Wire and Electronic Communications Over the Target Telephone</u>

The parties may be able to stipulate to the authenticity of the recorded conversations occurring to and from the Target Telephone. The recordings were intercepted, and the recordings include the date and time of the communication, the telephone numbers involved in the communication, and the duration of any voice communications.

If there is no stipulation, the Government will call a representative from T-Mobile, the cellular service provider for the Target Telephone, and the DEA case agent who supervised the wiretap. The T-Mobile representative will testify to receipt of the court order authorizing the interception of communications occurring to and from the Target Telephone, and the processes and equipment used by T-Mobile to participate in a court-ordered wiretap. A DEA agent will then

testify to the processes and equipment used by the DEA to receive data, including wire and electronic communications, from T-Mobile and how that was done in this case. The DEA agent will testify that the communications were recorded, the equipment was in working order and competently used, wire communications were monitored in real-time, the recordings have been properly preserved, and the recordings have not been altered. *See United States v. Milan*, 817 F. Supp. 1072, 1080-81 (S.D.N.Y. 1993). Recorded wiretap communications may be properly authenticated by a person who supervised the wiretap, but the witness need not have personally participated in the daily monitoring of the intercepted communications. *See United States v. Bosch*, 399 F. Supp. 2d 521, 522 (S.D.N.Y. 2005) (government may authenticate wiretap through use of the supervising agent, and need not call the individual agents and monitors who contemporaneously listened to each call); *United States v. Barnes*, 1996 WL 684391, at *3 (D. Conn. June 26, 1996).

Like the jail communications, the DEA case agent can also testify to the identify of the participants in communications due to his participation in the investigation, the telephone numbers used, and familiarity with the voices of participants.

Electronic messages may also be authenticated in several different ways, although Federal Rule of Evidence 901 does not provide any specific rule with regard to text messages. *United States v. Sterlin*, 466 Fed. Appx. 792, 797 (11th Cir. 2012). Evidence that an electronic message was obtained through a process or system that produces an accurate result is sufficient foundation under Rule 901. Fed. R. Evid. 901(9). Like telephone conversations, electronic messaging may be authenticated through similarities between the content of the message and actions of parties involved, *Sterlin*, 466 Fed. Appx. at 797, or when the content of the electronic message contains information particular to the defendant. *United States v. Fluker*, 698 F.3d 988, 1000 (7th Cir. 2012) (holding that emails contained information about bank accounts and housing programs that were known to the defendant). Additionally, evidence that a particular person was using the telephone that generated the messages is also sufficient. *United States v. Lundy*, 676 F.3d 444, 454 (5th Cir. 2012) (evidence that defendant was using phone at the time of his arrest was sufficient to authenticate text messages from that phone).

Here, again, the government intends to introduce evidence that the text messages were intercepted by the DEA during the eavesdropping investigation -- a computer generated process whereby agents receive the text messages directly from the telephone company, T-Mobile. DEA agents will also testify about subscriber information related to certain telephone numbers and the seizure of cellular telephones from Wiley, Harry, Watson, Brown, and other coconspirators.

### 5. Most Challenges Impact Weight, Not Admissibility

"Authentication of course merely renders the tapes admissible, leaving the issue of their ultimate reliability to the jury." *Tropeano*, 252 F.3d at 661. "Once a relevant tape recording has been sufficiently authenticated, any question as to the veracity of the recorded statements and the

credibility of the speakers goes to the evidence's weight rather than to its admissibility." *Hamilton*, 334 F.3d 186-87.

Similarly, allegations of "tampering or selective editing" of tapes go to weight, not admissibility. *Fuentes*, 563 F.2d at 532; *see United States v. Sovie*, 122 F. 3d 122, 127 (2d Cir. 1997) ("allegations of tampering went to the weight of the evidence rather than to its admissibility"); *Ruggiero*, 928 F.2d at 1304 (holding the same). "[Recordings] are not inadmissible merely because one can conjure up hypothetical possibilities that tampering occurred." *Rengifo*, 789 F.2d at 978 (citations omitted; internal quotation marks omitted); *see also United States v. Bello*, 1991 WL 45046, at *2 (S.D.N.Y. March 28, 1991).

Challenges to a witness's voice identification also go to weight, not admissibility. *See Tropeano*, 252 F.3d at 661; *United States v. Moyhernandez*, 17 Fed.Appx. 62, 70 (2d Cir. 2001). Challenges to the capacity of the device used to record the conversations at issue go to weight. *Tropeano,* 252 F.3d at 661*; see United States v. Capanelli*, 257 F. Supp. 2d 678, 681 (S.D.N.Y. 2003) (jury may be asked to reject the recordings as technically unreliable). And alleged "[b]reaks in the chain of custody do not bear upon the admissibility of evidence, only the weight of the evidence . . . ." *United States v. Morrison*, 153 F. 3d 34, 57 (2d Cir. 1998).

In addition, a recording is not rendered inadmissible simply because portions of it are inaudible. "The mere fact that some portions of a tape recording are inaudible does not by itself require exclusion of the tape . . . Our decisions in this area reveal a clear preference for the admission of recordings notwithstanding some ambiguity or inaudibility, as long as the recordings are probative." *United States v. Arrango-Correa*, 851 F. 2d 54, 58 (2d Cir. 1988); *see also United States v. Hemmings,* No. 10B2955Bcr, 2012 WL 1872605, at *1 (2d Cir. May 24, 2012) ("The question is not whether there are 'ambigu[ous]' or 'inaudib[le]' portions in the recordings, but whether the audible portions of the recordings retain probative value."); *United States v. Bryant*, 480 F. 2d 785, 790 (2d Cir. 1973); *United States v. Siddiqi*, No. 06 CR. 377, 2007 WL 2873924, at *1 (S.D.N.Y. 2007) (internal quotation marks omitted) ("Unless the unintelligible portions of a tape recording are so substantial as to render the recording as a whole untrustworthy, the recording is admissible and the decision to allow or exclude the recording should be left to the sound discretion of the judge.").

C.    Authentication and Use of Transcripts

1.    Authentication Standard

The standard for authenticating transcripts of recorded conversations is the same as that which applies to authentication of the recorded conversations themselves: the Government must present "clear and convincing evidence of authenticity and accuracy . . . sufficient to support a finding that the matter in question is what its proponent claims." *Rommy*, 506 F.3d at 137 (when transcripts are offered for use, either as evidence or a jury aid, they should be authenticated in the

same manner as tape recordings that are offered in evidence) (citations omitted; internal quotation marks omitted). A "district court's decision to admit . . . transcript[s] is reviewed for abuse of discretion." *United States v. Ben-Shimon*, 249 F. 3d 98, 101 (2d Cir. 2001) (citations omitted); *see United States v. Chalarca*, 95 F.3d 239, 246 (2d Cir. 1996).

## 2. Use of Transcripts

It is well-settled that when recordings of conversations in English are played for the jury, corresponding transcripts may be disseminated to aid jurors in "following along" at trial. *See United States v. Gay,* 85 Fed. Appx. 794 (2d Cir. 2004) (quoting *United States v. Ben-Shimon*, 249 F.3d 98, 101 (2d Cir. 2001)); *United States v. Chiarizio*, 525 F.2d 289, 294 n.3 (2d Cir. 1975); *United States v. Bryant*, 480 F.2d 785, 791 (2d Cir. 1973). In such cases, the transcripts are not evidence, but rather, are mere jury aids, used for a "limited, non-evidentiary purpose." *Gay*, 85 Fed.Appx., at *1-2 (citations omitted). Therefore, in this context, the transcripts are often accompanied by a limiting instruction which makes clear that "the tapes are the evidence and any conflict between the tapes and the transcripts must be resolved in favor of the former." *In Re Audibility of Certain Recorded Conversations*, 691 F. Supp. 588, 592 (D. Conn. 1988) (citing *Unites States v. Koska*, 443 F.2d 1167, 1169 n.1 (2d Cir. 1971); *see Barnes*, 1996 WL 684391 at *4 (jury instructed that "tapes themselves, not transcripts, were evidence").

District courts should take precautions to ensure that transcripts used at trial are accurate. *See Ben-Shimon*, 249 F.3d at 101 (citing *United States v. Carson*, 464 F.2d 424, 436-37 (2d Cir. 1972)). Specifically, if a defendant objects to the accuracy of Government transcripts provided to him in advance of trial, the district court should hold an *in camera* hearing to determine whether the parties can reach an agreement regarding the accuracy of the transcripts. *Id.*; *see Chiarizio*, 525 F.2d at 293-94. "[W]hen litigants disagree as to the precise words on a tape, or as to the accuracy of transcripts, the district court may permit each party to submit an alternative transcript to the jury." *Chalarca*, 95 F.3d at 246 (citations omitted); *see Carson*, 464 F.2d at 436-37 ("where the defense and the prosecution disagree as to the contents of the tape, the proper procedure is for the jury to receive transcripts of both sides' versions"). A defendant's failure to object to the Government's proposed transcripts in a timely fashion constitutes a waiver of the procedure discussed above. *See Chiarizio*, 525 F.2d at 293-94; *Cruz*, 765 F.2d at 1023 (defendant's failure to submit his own version of transcript at trial was barred from challenging admissibility of Government's transcript based on inaccuracies); *United States v. Llinas*, 603 F.2d 506, 509 (5th Cir. 1979) (defendant has burden of challenging accuracy of translation by presenting another translation).

In this connection, copies of all the wire and electronic communications have been provided in discovery, and the Government has provided draft transcripts of the specific calls it

intends to introduce at trial.[5] To date, no defendant has objected to the accuracy of the transcripts. If the defense has any proposed objections or corrections, we would ask that they be provided at least two weeks before evidence is scheduled to begin.

The Government would respectfully submit that instruction below should be given when transcripts are provided to the jury:

> The government has prepared transcripts that reflect its understanding of what appears in the recordings of intercepted conversations and who is speaking, and those transcripts will appear on the monitors before you. These transcripts are given to you as an aide, or a guide, to assist you in listening to the recordings. However, the transcripts are not in and of themselves evidence. Therefore, before the recordings are played, I instruct you to listen very carefully to the recordings themselves. You alone should make your own interpretation of what appears in each recording based on what you heard. If you think you heard something differently than it appeared on a transcript, then what you heard is controlling.

Adapted from Final Charge given in *United States v. Ojeda*, No. 3:07CR158 (AWT) (Court Exhibit 3 at 39-40).

## VIII. Electronic Evidence from Cellular Telephones Seized from Wiley, Harry, and Watson

At trial, the government will seek to admit electronic evidence obtained during the course of the investigation. The electronic evidence includes data extracted from cellular telephones seized from Wiley, Harry, and Watson. This data includes text message communications, photographs, video recordings, voice recordings, communications logs, and written notes.

The evidence from the Wiley, Harry, and Watson cellular telephones was extracted from the respective devices pursuant to search warrants.

### A. Cellular Telephone Data

As with other evidence, electronic evidence including communications, photographs, and video recordings stored to cellular telephones is admissible where the requirements of the Federal Rules of Evidence are satisfied.

---

[5] Additionally, the Government provided line sheets—most of which contained rough transcripts of the pertinent, intercepted communications—to accompany the recordings themselves in initial discovery last summer.

1.    <u>Authentication</u>

Courts considering the admissibility of electronic documents and communications have held that "'evidence may be authenticated in many ways' and 'the type and quantum of evidence necessary to authenticate [electronic sources] will always depend on context.'" *United States v. Ulbricht*, 79 F. Supp. 3d 466, 487-88 (S.D.N.Y. 2015) (quoting *United States v. Vayner*, 769 F.3d 125, 133 (2d Cir. 2014)).

The bar for authenticating evidence under Rule 901(a) "is not particularly high." *United States v. Gagliardi*, 506 F.3d 140, 151 (2d Cir. 2007). *See also United States v. Dhinsa*, 243 F.3d 635, 658 (2d Cir. 2001). It is met where "sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity and identification." *United States v. Tin Yat Chin*, 371 F.3d 31, 38 (2d Cir. 2004). Rule 901(b)(1) provides that testimony of a witness with knowledge satisfies the authentication requirement where it consists of testimony "that an item is what it is claimed to be." In addition, evidence "describing a process or system and showing that it produces an accurate result" is sufficient for authentication. Fed. R. Evid. 901(b)(9).

Electronic evidence may be authenticated by a witness with knowledge. For example, Fed. R. Evid. 901(b), permits authentication of data, like a chat communication, by a witness who participated in the communication. *See, e.g., Gagliardi*, 506 F.3d 389, 392-93 (2d Cir. 2007) (in prosecution for attempting to entice a minor to engage in prohibited sexual activity, e-mails and chat room communications between the defendant and a private citizen informant and undercover agent were authenticated by the informant and agent who "testified that the exhibits were in fact accurate records of Gagliardi's conversations with" persons he knew as "Lorie" and "Julie"; fact that the e-mails and transcripts of instant-message chats were imported into another document, were not originals and could have been edited did not prevent admission; "a reasonable juror could have found that the exhibits did represent those conversations, notwithstanding that the e-mails and online chats were editable"); *see also United States v. Barlow*, 568 F.3d 215, 220 & n.17 (5th Cir. 2009) (trial testimony of other participant to chat conversation "could sufficiently authenticate the chat log presented at trial"); *United States v. Tank*, 200 F.3d 627, 630 (9th Cir. 2000) (prima facie showing of authenticity established concerning chat room log printouts; witness "explained how he created the logs with his computer and stated that the printouts, which did not contain the deleted material, appeared to be an accurate representation of the chat room conversations among members of the Orchid Club").

Electronic evidence may also be authenticated by a witness familiar with the process used to obtain the data, like a case agent or a forensic examiner who accessed the cellular telephones. *See, e.g., United States v. Whitaker*, 127 F.3d 595, 601 (7th Cir. 1997) (in conspiracy to distribute marijuana case, a computer seized from one defendant's residence contained computer records of drug transactions and the drug business; rejecting argument that government was required to supply a witness with personal knowledge of the computer system; agent testimony authenticated

the computer printouts under Rule 901(a) including that the computer was seized during the execution of a warrant, the agent was present when the computer records "were retrieved from the computer using the Microsoft Money program," and the agent "testified concerning his personal knowledge and his personal participation in obtaining the printouts"), *cert. denied*, 522 U.S. 1137 (1998). This data would be attributable to certain defendants because testimony would establish that the devices were seized from a certain defendant, as well as other evidence linking them as the user of the telephone(s) (*e.g.*, subscriber information, user data obtained from the phone, photographs located on the device(s)). *See, e.g., United States v. Salcido*, 506 F.3d 729, 733 (9th Cir. 2007) (per curiam) (in prosecution involving the possession and receipt or distribution of material involving the sexual exploitation of minors, "the government properly authenticated the videos and images under Rule 901 by presenting detailed evidence as to the chain of custody, specifically how the images were retrieved from the defendant's computers").

Under Fed. R. Evid. 901(b)(4), authentication may be made by distinctive characteristics, which may include "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances." *See United States v. Vayner*, 769 F.3d 125, at 130 (2d Cir. 2014). Courts have relied upon this rule in admitting communications bearing distinctive characteristics.  For example, this may include the e-mail addresses used in the communications, the context and circumstances of the communications, and other surrounding circumstances. *See, e.g., United States v. Siddiqui*, 235 F.3d 1318, 1322 (11th Cir. 2000) (in fraud, false statements, and obstruction case, e-mail authenticated by contents and context, including e-mail address, automatic reply to sender, the messages indicated knowledge of matter, and use of nicknames; and foreign deposition testimony concerning phone conversations after e-mail messages were transmitted, applying Rule 901(b)(4)). Courts may also look to unique algorithmic digital fingerprints, including "hash values," created as a distinctive means during the analysis of a device. *See, United States v. Anderson,* 2021 WL 4427251 (E.D. Mich. 2021).

a.  Rejecting Speculative Defense Alteration Claims

Any possible defense claims that the electronic evidence is capable of being altered or modified should not preclude authentication and should be readily rejected, as other courts have done.  Questions concerning trustworthiness normally go to the weight of the evidence and not admissibility.  As one court noted in dismissing a challenge to admit e-mails communications:

"The defendant argues that the trustworthiness of these e-mails cannot be demonstrated, particularly those e-mails that are embedded within e-mails as having been forwarded to or by others or as the previous e-mail to which a reply was sent.  The Court rejects this as an argument against authentication of the e-mails.  The defendant's argument is more appropriately directed to the weight the jury should give the evidence, not to its authenticity.  While the defendant is correct that earlier e-mails that are included in a chain—either as ones that have been forwarded or to which another has replied—may be altered, this trait is not

specific to e-mail evidence. It can be true of any piece of documentary evidence, such as a letter, a contract or an invoice. Indeed, fraud trials frequently center on altered paper documentation, which, through the use of techniques such as photocopies, white-out, or wholesale forgery, easily can be altered. The possibility of alteration does not and cannot be the basis for excluding e-mails as unidentified or unauthenticated as a matter of course, any more than it can be the rationale for excluding paper documents (and copies of those documents). We live in an age of technology and computer use where e-mail communication now is a normal and frequent fact for the majority of this nation's population, and is of particular importance in the professional world. The defendant is free to raise this issue with the jury and put on evidence that e-mails are capable of being altered before they are passed on. Absent specific evidence showing alteration, however, the Court will not exclude any embedded emails because of the mere possibility that it can be done."

*United States v. Safavian*, 435 F.Supp.2d 36, 41 (D.D.C. 2006). After the proponent of the evidence has adduced sufficient evidence to support a finding that the proffered evidence is what it is claimed to be, the opposing party "remains free to challenge the reliability of the evidence, to minimize its importance, or to argue alternative interpretations of its meaning, but these and similar other challenges go to the weight of the evidence - not to its admissibility." *Tin Yat Chin*, 371 F.3d at 38.

2.      Hearsay Issues

As discussed in the context of the wire communications, any statements by a defendant is not hearsay. *See* Fed. R. Evid. 801(d)(2)(A). Further, any statements by other individuals are either not being offered for the truth of the matter asserted, *see* Fed. R. Evid. 801(c), or were made by a coconspirator "during and in furtherance of the conspiracy," Fed. R. Evid. 801(d)(2)(E). Finally, any portions of the communications not covered under the foregoing are admissible not for the truth of the matter asserted, but in order to render the conversation intelligible. *See United States v. Guzman*, 754 F.2d 482, 487 (2d Cir. 1985). The Government need not show that the person who heard (or received) the declarant's statement was also a member of the conspiracy. *See United States v. Minicone*, 960 F.2d 1099, 1110 (2d Cir. 1992);

B.      Duplicated Data

Under Rule 1001(3), an original is the writing or recording itself, a negative or print of a photograph or, "[i]f data are stored in a computer or similar device, any printout or other output readable by sight, shown to reflect the data accurately."

Under Rule 1001(4), a "duplicate" is "a counterpart produced by the same impression as the original, or from the same matrix, or by means of photography, including enlargements and

miniatures, or by mechanical or electronic re-recording, or by chemical reproduction, or by other equivalent techniques which accurately reproduces the original."

A duplicate is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original, or (2) under the circumstances, it would be unfair to admit the duplicate instead of the original.  Fed. R. Evid. 1003.

It is well-established that a copy or duplicate of original evidence is admissible to the same extent as the original and thereby excepted from the best evidence rule. Fed. R. Evid. 1003; s*ee also United States v. Knohl*, 379 F.2d 427, 439 (2d Cir. 1967) (approving admission of a re-recording of a tape-recorded conversation). The only exceptions to the admissibility of duplicates arise when "a genuine question is raised about the original's authenticity or the circumstances make it unfair to admit the duplicate." Fed. R. Evid. 1003. Moreover, any "breaks" in the chain of custody of digital evidence go to the weight of the evidence, not admissibility. *See, e.g., United States v. Jackson*, 345 F.3d 59, 65 (2d Cir. 2003) (alleged breaks in chain of custody typically bear upon weight, not admissibility); *United States v. Soulard*, 730 F.2d 1292, 1298 (9th Cir. 1984) ("[O]nce adequate foundational showings of authenticity and relevancy have been made, the issue of completeness then bears on the Government's burden of proof and is an issue for the jury to resolve.").

IX.    Preclusion of Hearsay Evidence of Defendants' Statements

The government respectfully moves to preclude the defendants from offering their own out-of-court statements, or those of coconspirators, during the cross-examination of government witnesses, as such statements would constitute hearsay. "Where the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible." *United States v. Marin*, 669 F.2d 73, 84 (1982). While the government is "free to introduce" a statement by a defendant as an admission by a party opponent, the defendants have "no right to introduce it on [their] own." *See United States v. Yousef*, 327 F.3d 56, 153 (2d Cir. 2003).

Through counsel, defendants Harry and Wiley have signaled their intent to offer statements of a coconspirator, or their own statements, as hearsay exceptions. To date, the Government does not know which statements the defendants may seek to introduce. Thus, it is difficult to determine whether those statements would constitute hearsay and, if so, be subject to a recognized hearsay exception.

But generally, under Fed. R. Ev. 801(d)(2)(E), a coconspirator cannot offer the statements of another coconspirator by claiming that the coconspirator is a party opponent. The Second Circuit has rejected coconspirators as party opponents "because the admission sought to be introduced was made by a co-defendant who is not a party opponent. The Government is the party opponent

of both defendants." *United States v. Harwood*, 998 F.2d 91, at 97-98 (1993) *quoting United States v. Gossett*, 877 F.2d 901, 906 (11th Cir. 1989).

## X.    Drug Expert Testimony

### A.    The Nature of the Testimony[6]

The Government intends to call a Special Agent from the Drug Enforcement Administration, Carlos Penagos, as an expert in narcotics investigations. The Government's witness was not involved in the investigation into the Wiley drug trafficking organization. Rather, testimony would address matters that are outside the experience and capacity of the average juror and have been found by courts to be appropriate subjects for expert testimony in narcotics cases. For example, the expert witness is expected to testify about wholesale and street-level retail prices for controlled substances; the manner in which controlled substances are prepared and packaged for distribution, including differences between wholesale and "street-level" distribution quantities; the processing of controlled substances for distribution, including dilution of purity of substances to increase the volume available for sale; weights by which certain controlled substances are typically sold; the organization or structure of drug trafficking operations; tools of the trade used by drug traffickers; anti-surveillance strategies employed by drug organizations and other pertinent matters. The witness may also be asked about typical practices of narcotics traffickers as to cellphone use and the use of Apple FaceTime and other messaging applications, as well as the use of coded language in cellphone or messaging communications. Testimony will not be specific to the operation of the defendants or the Wiley drug trafficking organization; indeed, the witness does not know anything about the defendants in particular. Rather, the witness will testify based on years of experience with hundreds of narcotics investigations about the general methods and means of narcotics traffickers.

---

[6] The Government has also prepared proposed stipulations relative to the examination of drug exhibits by forensic chemists. If the defendants do not agree to stipulate to the examination of the drug exhibits, the Government intends to call five expert forensic chemists to testify concerning their analysis of the controlled substances seized during the investigation. Their reports have been provided to the defense along with their curriculum vitae.

The other evidence that may be introduced via expert testimony are the processes used to extract data from cellular telephones, specifically using Cellebrite software, and the analysis of cellular site data. The phone extractions and cellular site data have been provided to the defense. The Government also intends to call an expert in forensic accounting and analysis of banking records. The underlying Bank of America records have been provided to the defense. Testimony about forensic analysis of cellular telephones, cellular site data, and analysis of bank records would fall outside of the ken of the average juror. Finally, the Government may introduce expert testimony related to the valuation of jewelry seized from Wiley and Harry.

B.     The Law on Agent Expert Testimony

The Second Circuit has repeatedly held that "the operations of narcotics dealers are a proper subject for expert testimony under Fed. R. Evid. 702 . . . where the subject matter of the testimony is beyond the ken of the average juror." *United States v. Mejia*, 545 F.3d 179, 191 (2d Cir. 2008); *United States v. Dukagjini*, 326 F.3d 45, 52 (2d Cir. 2003). While the Second Circuit cautioned that an agent, particularly one testifying both as a fact witness and as an expert, should not address the particular facts of a case, s*ee United States v. Scott*, 2009 WL 36548 (S.D.N.Y. January 7, 2009) (discussing *Mejia*), the Court has also repeatedly found that agent experts can testify about matters including the "structure, leadership, practices, terminology and operations" of narcotics trafficking organizations. *Mejia*, 545 F.3d at 196 (citing and quoting *United States v. Feliciano*, 223 F.3d 102, 109 (2d Cir. 2000)). Thus, courts have allowed expert testimony about the meaning of words and phrases used by narcotics traffickers. *United States v. Simmons*, 923 F.2d 934, 946 (2d Cir. 2018) ("Expert testimony in the field of narcotics operations is often helpful to jurors 'who [are] likely unfamiliar with words and phrases used by narcotics dealers to camouflage their activities.'" (quoting *United States v. Kusek*, 844 F.2d 942, 949 (2d Cir. 1988); *United States v. Reddick*, 284 F.Supp.3d 159 (D. Conn. 2018) (allowing testimony to "the general practice of narcotics sellers and buyers to use coded language and the meaning of common drug slang terms"). Drug experts have been allowed to testify about methods of processing and packaging drugs for sale, *Reddick*, 284 F. Supp.3d 161-162, the tools of the narcotics trade, *id., see also United States v. Scott*, 2014 WL12693078 at *3 (D. Conn. 2014), typical prices, *Reddick, supra*, and distribution quantities, as opposed to those for personal use. *United States v. Skyers*, 787 F..App'x. 771, 775 (2d Cir. 2019).

Drug agents know from their training and experience, for example, that traffickers often avoid subscribing cellular telephone accounts in their true names using prepaid cellular telephones, which can be activated by purchasers who provide no subscriber information whatsoever at the time of purchase. They know that drug traffickers switch phones frequently, and often use Apple FaceTime or messaging apps, which are not intercepted through use of a wiretap, when they want to avoid detection. Agents are familiar with the paraphernalia and tools of the trade including cutting agents, packaging materials, etc. This list, too, represents but a sampling of the knowledge that agents possess regarding the techniques commonly employed by narcotics traffickers, all of which is beyond the ken of the average juror.

The Second Circuit has expressly "recognized that drug dealers often camouflage their discussions and that expert testimony explaining the meanings of code words may 'assist the trier of fact to understand the evidence or determine a fact in issue.'" *Dukagjini,* 326 F.3d at 52 (quoting Fed. R. Evid. 702) (citing *United States v. Simmons*, 923 F.2d 934, 946 (2d Cir. 1991)). The Court, therefore, has "consistently upheld the use of expert testimony to explain both the operations of drug dealers and the meaning of coded conversations about drugs." *Dukagjini*, 326 F.3d at 52 (citing *United States v. Garcia*, 291 F.3d 127, 139 (2d Cir. 2002)); *United States v. Ruggiero*, 928

F.3d 1289, 1304-05 (2d Cir. 1991); *Simmons*, 923 F.2d at 946-47). The Second Circuit has also identified no error when a properly qualified expert offered testimony as to the price, weight, and distribution methods of illegal narcotics in a specific locale. *See United States v. Garcia*, 413 F.3d 201, 216 (2d Cir. 2005); *United States v. Tapia-Ortiz*, 23 F.3d 738, 741 (2d Cir. 1994) ("Testimony about the weight, purity, dosages, and prices of cocaine clearly relates to knowledge beyond the ken of the average juror.").

In both *Mejia* and *Dukagjini*, the Second Circuit identified the "heightened risk" of prejudice when case agents with personal knowledge of the defendant are permitted to testify as experts. *See Dukagjini*, 326 F.3d at 56; *Mejia*, 545 F.3d at 196. But, as explained above, neither case prescribed the use of an "officer expert" as a matter of law. Rather, these cases simply annunciate the limitations of appropriate officer expert testimony. And, as noted previously, the expert witness is not the case agent here; nor is he a fact witness. Testimony will be based on overall experience and not on anything specific to this case. Thus, the caselaw supports the Government's presentation of Special Agent Penagos as a drug expert.

XI.     Use of Summaries

A.     Introduction

The Government anticipates presenting a number of summary exhibits at trial that will assist the jury in its understanding of the evidence and in making the determinations it will be charged with making. Each of these exhibits will be presented at or near the conclusion of the Government's evidence, after the jury has heard and seen the testimony and exhibits that are part of the Government's case. These summaries pertain to documentary evidence that is voluminous and would be difficult for a jury to organize themselves. For example, a summary of voluminous Bank of America transaction records would be helpful to the jury. So too would mapping of voluminous cellular site data, showing relevant periods of time, be helpful to the jury and streamline the presentation of evidence.

B.     The Law

Federal Rule of Evidence 1006 provides as follows:

> The proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court. The proponent must make the original or duplicates available for examination or copying, or both, by other parties at a reasonable time and place. And the court may order them proponent to produce them in court.

The Rule therefore requires that the evidence underlying the summary or calculation be voluminous, admissible (although not necessarily admitted), reasonably available to the opposing side, accurate, and non-prejudicial. *See United States v. Bishop*, 264 F.3d 535 (5th Cir. 2001); *see*

*also United States v. Bray*, 139 F.3d 1104 (6th Cir. 1998) (substantial discussion of the bases for admission of summary exhibits and testimony); *United States v. Scales*, 594 F.2d 558, 563-64 (6th Cir. 1979) (noting the "established tradition" that permits a summary of evidence to be put before a jury with proper limiting instructions); *United States v. Conlin,* 551 F.2d 534, 538 (2d Cir. 1977).

The case against the defendant involves a lengthy period of time and a variety of controlled substances, as well as a number of different co-conspirators. Certain records and data that are evidence of the defendants' trafficking are voluminous, and the jury would find it difficult and highly inconvenient at best to organize, parse, and fully comprehend the information in the records. *See United States v. Fahnbulleh*, 752 F.3d 410, 419 (D.C. Cir 2014); *United States v. Aubrey*, 800 F.3d 1115, 1130 (9th Cir. 2015); *United States v. Rizk*, 660 F.3d 1125, 1131 (9th Cir. 2011). The Government expects to call witnesses that have reviewed and analyzed the underlying records and prepared and/or reviewed the summaries that we intend to present. These witnesses will explain the summaries on the stand. Further, the full and complete records have been provided to the defense, will be marked as exhibits and entered into evidence, and are admissible. In these circumstances, the summaries we intend to present – and will provide to the defense before trial – should be admitted. *Scales*, 594 F.2d at 563-64; *Conlin*, 551 F.2d at 538.

The Government does not seek to begin its case with a summary or overview witness who provides a preview of what is to come, something the Second Circuit has rejected. *United States v. Garcia*, 413 F.3d 2 (2d. Cir. 2005). Neither do we intend to present exhibits that do not accurately reflect the evidence. *See Taylor*, 210 F.3d at 315-316. What we seek to do is present, at or near the conclusion of the Government's case-in-chief, exhibits which accurately summarize, organize, and clarify evidence that pertains directly to the issues the jury will need to decide. We seek the Court's authorization to do so.

XII.   Witness Sequestration

The Government hereby requests that the case agent from the DEA, Special Agent Andrew Hoffman, who is expected to testify at trial, be exempted from witness sequestration. The Government requests exemption of Special Agent Hoffman under Rule 615(b) & (c) of the Federal Rules of Evidence.

Rule 615 instructs that "the court must order witnesses excluded so that they cannot hear other witnesses' testimony" if a party makes a request or the Court so decides *sua sponte*. However, Rule 615(b) carves out an exception to this general rule for a witness who is "an officer or employee of a party that is not a natural person, after being designated as the party's representative by its attorney." Based on that Rule, the Second Circuit has held that the district court has "discretion to exempt the government's chief investigative agent from sequestration, and it is well settled that such an exemption is proper under Rule 615(b), deeming the agent witness a 'representative' of the government." *United States v. Rivera*, 971 F.2d 876, 889 (2d Cir. 1992); *see also, United States v. Pellegrino*, 470 F.2d 1205, 1208 (2d Cir. 1972). Rule 615(c) carves out

an additional exception for a witness who "is a person whose presence a party shows to be essential to presenting the party's claim or defense." *See United States v. Phibbs*, 999 F.2d 1053 (6th Cir. 1993) (Rule 615 does not restrict the number of witnesses who may be deemed "essential" to presentation of the case.).

In ruling on a request to sequester pursuant to Rule 615, the court should consider several factors: whether the testimony in question will involve controverted and material facts; whether the information is of the type that is normally subject to "tailoring;" the extent to which the testimony in question will encompass the same issues as other witnesses; the order in which the witnesses will testify; any motivation on the part of the witness to modify his testimony; and, if Rule 615(c) applies, whether the witness' testimony is "essential" or merely desirable. *United States v. Jackson, 60 F.3d 128,* at 135 (2d Cir. 1995).

The underlying investigation of this case was complex and lengthy, spanning nearly two years. Special Agent Hoffman was the case agent throughout that time, participating in all aspects of the case, and he gathered substantial evidence from the investigation, including information from Wiley's Yonkers, New York arrest. The Government anticipates presenting the testimony of New York law enforcement witnesses, the testimony of Connecticut agents and officers, and the testimony of a number of civilian witnesses involved in the production of documents relevant to the investigation. Special Agent Hoffman is an indispensable resource for trial purposes.

In considering the factors discussed in *United States v. Jackson*, *supra*, Special Agent Hoffman will testify concerning evidence of the conspiracy – its participants and the type and quantity of the controlled substances at its heart – but there is little to no risk of "tailored testimony." Special Agent Hoffman will be subject to cross examination, and he has provided sworn statements during the investigation, including grand jury testimony and numerous affidavits for Court-authorized interceptions and for search and arrest warrants, as well as DEA reports, all of which have been, or soon will be, provided to the defense for use on cross-examination. Furthermore, much of his testimony will pertain to records and information he has procured during the investigation and his analysis of it – records obtained from the wiretap, cellular telephones, social media records, financial records. Such testimony is not amenable to "tailoring" based on the testimony of other witnesses. Special Agent Hoffman's presence in the courtroom during the testimony of other witnesses does not pose such a risk in any event as he has already interacted with most anticipated witnesses and has been privy to the grand jury testimony in the case, as authorized by Rule 6(e) of the Federal Rules of Criminal Procedure. Thus, he is already well aware of what the various witnesses have to say.

Given his extensive involvement and the depth of his knowledge of the evidence, Special Agent Hoffman's presence at trial is necessary to assist in the presentation of the substantial evidence and to meet trial surprises, including the anticipated cross-examination of various witnesses.

Accordingly, the Government respectfully requests that Special Agent Andrew Hoffman be exempted from witness sequestration under Federal Rule of Evidence 615.

XIII.   Notice Regarding Watson's Prior Convictions

During cross-examination of defendant Watson or any offered character witness, the Government anticipates potentially offering evidence under Rules 608 and 609 of Watson's criminal history, which includes convictions in the Connecticut Superior Court for possession with intent to distribute, in violation of Conn. Gen. Stat. § 21a-277(a) on or about May 8, 2018; possession with intent to distribute, in violation of Conn. Gen. Stat. § 21a-277(a) on or about May 14, 2018; possession with intent to distribute, in violation of Conn. Gen. Stat. § 21a-277(a) on or about February 24, 2017; as well a conviction in the United States District Court for the District of Connecticut (3:16-cr-216) for: possession with intent to distribute and distribution of heroin, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(c) on or about February 23, 2017.

Respectfully submitted,

VANESSA ROBERTS AVERY
UNITED STATES ATTORNEY

___/s/_____
PATRICK J. DOHERTY
Federal Bar No. PHV10400
ELENA L. CORONADO
Federal Bar No. PHV09758
ROBERT S. DEARINGTON
Federal Bar No. ct28862
ASSISTANT U.S. ATTORNEYS
1000 Lafayette Blvd., 10th Fl.
Bridgeport, Connecticut 06604

## <u>CERTIFICATE OF SERVICE</u>

  This is to certify that on June 14, 2022, a copy of the foregoing Government's Trial Memorandum was filed electronically and served by first-class United States mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

<br>

    ___*/s/*_____
    PATRICK J. DOHERTY
    ASSISTANT U.S. ATTORNEY