UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA | Crim. No. 3:21-cr-98 (JBA) |
| *v.* | |
| TAJH WILEY | December 16, 2022 |

**ORDER DENYING MOTION FOR A NEW TRIAL AND FOR JUDGMENT OF ACQUITTAL**

On July 25, 2022, Tajh Wiley ("Defendant") was convicted by jury verdict of conspiracy to distribute and to possess with intent to distribute an unspecified amount of fentanyl, 500 grams or more of cocaine, and marijuana between 2020 and 2021 (Count 1), and of possession with intent to distribute cocaine base (Count 4). (Jury Verdict [Doc. # 457].)  Defendant moves for a new trial [Doc. # 492] on the grounds that the Court should not have instructed the jury on a lesser included offense for the fentanyl count, and that the jury should have been given a multiple conspiracies theory. (Def.'s Mem. in Support for Mot. for New Trial ("Def.'s New Trial Mem.") [Doc. # 492-1] at 1.) Defendant also moves for a judgment of acquittal [Doc. # 493] on the grounds that the evidence at trial was insufficient to support (1) a conviction for possession with intent to distribute an unspecified amount of fentanyl, (2) a conviction for conspiracy to distribute 500 grams or more of cocaine, or a (3) a conviction for possession with intent to distribute cocaine base. (Def.'s Mem. in Support of Mot. for J. of Acquit. ("Def's Acquit. Mem.") [Doc. # 493-1] at 1.)

I.     **Discussion**

A.     **Motion for a New Trial**

A mistrial is warranted when "taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated." *United States v. Millan*, 817 F. Supp. 1086, 1088 (S.D.N.Y. 1993) (citing *United States v. Peng*, 602 F. Supp. 298, 304 (S.D.N.Y.), *aff'd*, 766 F.2d 82 (2d Cir.1985). When seeking a new trial

based on the jury instructions, the Defendant must show both "error and ensuing prejudice." *United States v. Quinones*, 511 F.3d 289, 313–14 (2d Cir.2007). An instruction is given in error when "viewed as a whole," it "either failed to inform the jury adequately of the law or misled the jury about the correct legal rule." *Id.*[1] "The decision to declare a mistrial is left to the sound discretion of the judge, but the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes." *Renico v. Lett*, 559 U.S. 766, 774, (2010).

### 1.    Lesser Included Offense

Under Federal Rule of Criminal Procedure 31(c)(1), a defendant can be convicted of "an offense necessarily included in the offense charged." However, "[w]hen the trial evidence or the jury charge operates to broaden[ ] the possible bases for conviction from that which appeared in the indictment," *United States v. Milstein,* 401 F.3d 53, 65 (2d Cir.2005), the indictment has been constructively amended, which is a "*per se* violation of the Grand Jury Clause of the Fifth Amendment." *United States v. Rigas,* 490 F.3d 208, 226 (2d Cir. 2007) "To prevail on a constructive amendment claim, a defendant must demonstrate that 'the terms of the indictment are in effect altered by the presentation of evidence and jury instructions which so modify *essential elements* of the offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment." *United States v. D'Amelio,* 683 F.3d 412, 416 (2d Cir. 2012) The Second Circuit "has proceeded cautiously in identifying such error, 'consistently permitt[ing] significant flexibility in proof, provided that the defendant was given *notice* of the *core of criminality* to be proven at trial.'" *United States v. Agrawal*, 726 F.3d 235, 259–60 (2d Cir.2013) ((quoting *D'Amelio*, 683 F.3d at 417.).

---

[1] Unless otherwise indicated, internal citations, quotation marks, and other alterations are omitted throughout in text quoted from court decisions.

Defendant argues that because the Government decided to charge him with conspiracy to distribute and possess with intent to distribute 400 grams or more of fentanyl in the indictment but did not choose to charge in the alternative a lesser included amount of fentanyl, the Court should not have instructed the jury on the lesser included drug quantity. (Def.'s New Trial Mem. 2-3.) Rather than being a case where the lesser included charge was a benefit that accorded him the "full benefit of the reasonable doubt standard," Defendant argues that because the element of 400 grams or more of fentanyl is an "extra" element, the lesser included charge for an unspecified amount of fentanyl was not identical to the charge in the indictment. (*Id.* at 3-4)

The Government contends that an "indictment need not charge the defendant with the lesser [included] offense in order for the trial court to submit that offense to the jury." (Gov't's Opp'n Mem. to Def.'s Rule 29 and Rule 33 Mots. [Doc. #598] at 63) (citing *United States v. Dhinsa*, 243 F.3d 635, 674 (2d Cir. 2001)). Because the jury must necessarily decide that some level of fentanyl was involved in the conspiracy with intent to distribute to then decide the 400-gram threshold, the Government argues that including the lesser included offense requiring only a finding that the conspiracy involved an unspecified quantity of fentanyl was not an extra element, but instead a necessary predicate finding for the charged offense. (Gov't's' Mem. at 63.) The Government compares this case to *United States v. Taylor,* where the defendant was charged with conspiracy to distribute and possess with intent to distribute five kilograms or more of cocaine. 816 F.3d 12, 16 (2d Cir. 2016). In *Taylor*, the court instructed the jury that it "must determine whether the weight of that mixture or substance was five kilograms or more, or if it was 500 grams or more, or if it was less than 500 grams." *Id.* at 17. The jury convicted the defendant of conspiracy to possess with intent to distribute 500 grams of cocaine. *Id.* The Second Circuit upheld the district court's instruction, explaining:

The court instructed the jury on the two essential elements of conspiracy—the existence of a conspiracy and Taylor's willfully joining it. The court also instructed the jury on the drug quantity element required for narcotics offenses under 21 U.S.C. § 841(b) . . . Finally, the court explained that "should you determine that the conspiracy charged in count one involved a mixture or substance containing cocaine, you must determine whether the weight of that mixture or substance was five kilograms or more, or if it was 500 grams or more, or if it was less than 500 grams." The special verdict form separated the issue of conspiratorial liability from quantity, expressly giving the jury the option of finding Taylor guilty of a conspiracy involving five kilograms or more of cocaine, or of the lesser included offenses of a conspiracy involving 500 grams or more or less than 500 grams. Having been properly charged on the lesser included offenses, the jury determined that Taylor conspired to distribute and possess with intent to distribute "500 grams or more" of cocaine.

*Id.* at 19.

The Superseding Indictment in this case charged Defendant with conspiring to "distribute, and possess with intent to distribute, controlled substances, namely a mixture and substance containing a detectable amount of [fentanyl]," and that he should have "foreseen from [his] own conduct and that of other member[s] of the narcotics conspiracy that the conspiracy involved 400 grams or more of a mixture and substance containing [fentanyl]." (Gov't Mem. at 63.) The Court instructed the jury that to convict on Count One, it needed to find "that the drug conspiracy existed," and "that each defendant knowingly and willfully became a member of that conspiracy." (Jury Instructions at 13.) If the finding was affirmative on both elements, the Court then instructed that the jury "must then determine the quantity or weight of fentanyl that the Government has proved . . ." (*Id.* at 22.) The Court explained that the "verdict form" would ask the jury to "determine whether the conspiracy involved the quantity of controlled substance charged, and whether such quantity was 'reasonably foreseeable' to Tajh Wiley." (*Id.* at 24.) The verdict form, in turn, first asks whether 400 grams or more of fentanyl was reasonably foreseeable; if the answer is no, it instructs the jury to then determine whether an "unspecified quantity of a mixture or

substance containing a detectable amount of fentanyl" was reasonably foreseeable. (Jury Verdict [Doc. # 457].)

As in *Taylor,* these instructions and verdict form are "not a constructive amendment of the indictment," but "simply [permit] a conviction for a lesser included offense of the offense charged in the indictment." *Taylor,* 816 F.3d at 19. Defendant offers no rebuttal to the precedential effect of *Taylor,* and his argument takes an overly broad approach to constructive amendment; to be a proper lesser included offense under the federal rules, the elements need not be *identical,* but must be a subset of the elements of the charged offense. *See United States v. Robins,* 673 F. App'x 13, 20 (2d Cir. 2016). As the Government contends, conspiracy to distribute an unspecified quantity of a mixture or substance containing a detectable amount of fentanyl is necessarily included in a charge of conspiracy to distribute 400 grams or more of the same.

### 2.    Multiple Conspiracies Charge

To be granted a new trial based on a failure to give a multiple conspiracies instruction, the Defendant "bears the burden of showing that the requested instruction accurately represented the law in every respect, and that, viewing as a whole the charge actually given, he was prejudiced." *United States v. Applins*, 637 F.3d 59, 72 (2d Cir. 2011). "[I]f only one conspiracy has been alleged and proved[,] the defendants are not entitled to a multiple conspiracy charge," *United States v. Martino,* 664 F.2d 860, 875 (2d Cir. 1981), *cert. denied,* 458 U.S. 1110 (1982). For the charge to be warranted, there should be evidence of "separate networks operating independently of each other," *United States v. Maldonado-Rivera*, 922 F.2d 934, 962 (2d Cir. 1990).

Defendant argues that the evidence at trial supported his claim that there were multiple conspiracies because there were alleged conspirators both throughout Connecticut and the United States, and multiple controlled substances and quantities were involved.

Defendant asserts that "a fair interpretation of this evidence could also have established Wiley's involvement in multiple separate drug conspiracies," especially in light of evidence that "there were no set schedules with these individuals as to Wiley's drug transactions, which is otherwise commonly encountered in drug conspiracies." (Def.'s New Trial Mem. at 7-8.) The prejudice, Defendant contends, was that "the jury was able to aggregate the drug quantities of these transactions, even though they may not have been part of the charged conspiracy." (*Id.*)

The Government argues that Defendant failed to prove that there were two or more groups operating separately from one another, and that his involvement in "multiple drug transactions" with "different individuals" was entirely consistent with a single polysubstance conspiracy with Defendant at the center as the hub, in which Defendant sourced supply for his conspiracy with Kenston Harry from Sashery Feliz, both co-defendants, and other unknown individuals; packaged the product with Harry; and offered it to Peter Munoz, Charles Richardson, Jevaughn Watson, "Wiz BK", and others for distribution. (Gov't Mem. at 67.) The Government also pointed to interactions between members of the conspiracy, such as co-defendant Myron Brown's visit to Harry's residence while Defendant was present, and Watson's text to an unknown number with a picture of marijuana and Harry's Action Audio store address, as evidence that the various members of the conspiracy were "aware of the larger organization" and their part in it. (*Id.* at 67-68.) Finally, the Government argues that even if a multiple conspiracies charge should have been given, there was no prejudice, because a rational jury could have inferred based on the cocaine found on Defendant during his Yonkers arrest and the call from Defendant to Harry following the arrest that a conspiracy to possess with intent to distribute 500 grams cocaine existed between Defendant and Harry alone. (*Id.* at 69-70.)

Although the charged conspiracy did involve multiple individuals and locations "lapses of time, changes in membership, or shifting emphases in the locale of operations [do not] necessarily convert a single conspiracy into multiple conspiracies." *United States v. Maldonado-Rivera*, 922 F.2d 934, 963 (2d Cir. 1990). The Government's theory is similar to the one advanced and affirmed in *United States v. Evans,* where the court found that the "fact that not each of the conspirators was acquainted with each of the others is of no significance" because it was sufficient to prove "that each knew from the scope of the operation that others were involved in the performance of functions vital to the success of the business." 293 F. App'x 63, 67 (2d Cir. 2008) (citing *United States v. Sisca*, 503 F.2d 1337, 1345 (2d Cir.1974)). As in *Evans,* the evidence at trial suggested that even if various members and co-defendants like Brown, Watson, Feliz, and others only interacted with the "core group," the jury could find that they "knew [that they were] one of many street-level sellers" for the "core group," and thus part of a larger conspiracy. *Id.* at 67.

### B.   Motion for Judgment of Acquittal

Federal Rule of Criminal Procedure 29(a) requires a judgment of acquittal "of any offense for which the evidence is insufficient to sustain a conviction." The Court "must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence," *United States v. Coplan*, 703 F.3d 46, 62 (2d Cir. 2012) (quotation omitted), and grant the motion only "if it concludes that no rational trier of fact could have found the defendant guilty beyond a reasonable doubt." *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003). The evidence must be viewed in "totality, not in isolation," *United States v. Huezo*, 546 F.3d 174, 178 (2d Cir. 2008), because "each fact may gain color from others." *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999).

####     1.     Sufficiency of the Evidence as to an Unspecified Amount of Fentanyl

To support a conviction for conspiracy with intent to distribute a particular substance, the record must show "(1) the existence of the conspiracy charged; (2) that the defendant had knowledge of the conspiracy; (3) that the defendant intentionally joined the conspiracy, and (4) that he acted with the specific intent that the [controlled substance] be distributed." *United States v. Wise*, No. 18-CR-26-FPG, 2019 WL 988452, at *3 (W.D.N.Y. Mar. 1, 2019), *aff'd sub nom. United States v. Weathersby*, 858 F. App'x 460 (2d Cir. 2021). "When a defendant challenges the sufficiency of the evidence in a conspiracy case, 'deference to the jury's findings is especially important . . .  because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel.'" *United States v. Santos*, 541 F.3d 63, 70 (2d Cir. 2008) (quoting *United States v. Morgan*, 385 F.3d 196, 204 (2d Cir. 2004)).

The Government argues that the following evidence supports Defendant's conviction for conspiracy to possess with intent to distribute an unspecified amount of fentanyl:

- A call on April 20, 2021, in which Defendant was speaking to Feliz, and told someone in the background of the call to "put your mask on when you bag that shit up . . That's Fetty," accompanied by testimony from Special Agent Penagos that fentanyl traffickers typically use protective gear such as masks and gloves, (Gov't Mem. at 39);

- Defendant's voice memo to Harry on May 16, 2021, in which he said he had a "play for the F – the other shit," followed by a later response from Harry stating "I'm on my way," and accompanied by testimony from Special Agent Penagos that "F" can be coded language for fentanyl, (*id*. at 40-41);

- A call between Defendant and "Al Springfield" (an unknown male in Springfield, Massachusetts with whom Defendant regularly communicated) on May 22, 2022, where Defendant referenced a prior conversation about a substance that was "[n]ot with weed, not with you, not your lane. But the lane I been, I been dealing with." Defendant asks whether Al Springfield had access to that substance; Springfield asks "I mean, what you was talking about? You not talking about the [Stammers] Effie [Ph]. You talking about that actual shit?" to which Defendant replies "Yeah, yeah. Yeah, that." To clarify what he is requesting, Defendant says "[n]ot what I grabbed off you before and not what you fuck with. The other lane." Springfield replies "[y]eah, yeah. Some of that dog food," and Defendant confirms "[y]eah, the F. Yeah." Special Agent Penagos also testified "F" and "Effie" can be coded language for fentanyl, (*id*. at 41-42, Def.'s Acquit. Mem. at 7);

- The kilogram of fentanyl found at Kenston Harry's house, (*id*. at 43);

- A music video in which Defendant said "dope is a 5, put that fetty in it and turn to an 8," (*id.* at 44);

- A call to Destiny Wade and another co-conspirator from Yonkers where while discussing his arrest, Defendant said that law enforcement in New York "don't be bugging like that if it ain't no fentanyl or nothing like that," (*id.* at 45);

- Two notes on Defendant's phone, one stating "1000 grams of fet, that's what my wrist," and another note reading "[m]ix that fetty with that quinine I'm making it a double." (*Id.* at 45).

Defendant challenges the relevance of several of the above incidents or pieces of evidence. For example, the Defendant argues that the Court can conclude from the jury verdict that the jury did not believe he was involved in a fentanyl conspiracy with Harry,

9

because otherwise, it would have found him guilty of the kilogram quantity of fentanyl. (Def.'s Acquit. Mem. at 4.) However, as the Government points out, while the jury clearly did not attribute the full amount of the substances to Defendant based on his acquittal on that count, a "rational juror could conclude that Wiley used Harry's home for preparing fentanyl for distribution" based on its presence there and their prior communications, thus inferring Harry's participation in Wiley's conspiracy. (Gov't Mem. at 43-44.) As for the call with Feliz, Defendant argues that he "simply alerted the unidentified individual that it would be prudent to put a mask on when the individual bagged 'fetty' or fentanyl," and that the call "does not confirm that the individual or Wiley were involved in any kind of drug conspiracy together." (Def.'s Acquit. Mem. at 6.) However, as the Government observes, "a rational juror could conclude that the fentanyl referenced in this call did in fact belong to Wiley because he informed the unknown individual that the controlled substance contained fentanyl, whereas the unknown individual may not have been aware of the nature of the substance and the necessary safety precautions." (Gov't Mem. at 40.)

Similarly, while Defendant contends that the call between Harry and Defendant referencing a "play for the F" might not reference fentanyl, because Special Agent Penagos said that "F" could also mean "fire," (Def.'s Acquit Mem. at 6), the Government points out that the jury's verdict suggested that they instead credited Special Agent Penagos' assertion that "F" could mean "fentanyl." (Gov't Mem. at 41.) Defendant also asserts that the conversation between Defendant and Al Springfield suggests that Defendant was *not* seeking fentanyl, as evidenced by Springfield saying "You not talking about the . . . Effie," but that instead the conversation implies that Defendant was seeking some other substance. (Def.'s Acquit. Mem. at 7.) The Government argues that a "rational juror could conclude that Al Springfield colloquially asked whether Wiley was inquiring about 'effie,' versus the 'actual shit,' heroin," and points to Defendant's confirmation that he was looking for "the F" as evidence to buttress

its interpretation. (Gov't Mem. at 42.) In both cases, Defendant's alternate interpretations of the evidence are the same ones that were presented and rejected at trial, and on a motion for acquittal, the Court must credit "every inference that the jury might have drawn in favor of the government," *United States v. Temple*, 447 F.3d 130, 136–37 (2d Cir. 2006)), including on "the weight of the evidence and the credibility of the witnesses." *United States v. Reifler*, 446 F.3d 65, 94 (2d Cir. 2006). When "viewed not in isolation but in conjunction," the totality of the evidence was sufficient to permit a reasonable jury to conclude that Defendant joined a conspiracy to possess with intent to distribute an unspecified amount of fentanyl, and so the Court will defer to "the jury's choice of the competing inferences that can be drawn from the evidence." *Id.*

### 2.     Sufficiency of the Evidence of 500 Grams or More of Cocaine

"The drug quantity attributable to a defendant knowingly participating in a drug distribution conspiracy includes (1) transactions in which he participated directly; (2) transactions in which he did not personally participate, but where he knew of the transactions or they were reasonably foreseeable to him; and (3) quantities he agreed to distribute or possess with intent to distribute regardless of whether he ultimately committed the substantive act." *United States v. Pauling*, 924 F.3d 649, 657 (2d Cir. 2019). In determining the sufficiency of the evidence with regard to the amount of substance involved in the conspiracy, "quantities of controlled substances in a drug distribution conspiracy prosecution may be determined through extrapolation, approximation, or deduction" as long as there is "evidence of known quantities, which are sufficiently representative of the unknown quantities and from which an approximation of the unknown quantities can logically be derived." *Id.*

Defendant's arguments echo many of those made with regard to the fentanyl conspiracy; he argues that the Government failed to prove the "majority" of the individuals

alleged to be in the conspiracy knew each other and/or had some other conspiratorial connection, or that they "shared a stake in each other's success in drug dealing." (Def.'s Acquit. Mem. at 9.) The Government asserts that the following evidence supports the conviction:

- Defendant's counsel's concession during closing argument that Defendant and Harry were involved in a conspiracy to distribute cocaine, albeit in an amount less than 500 grams (Gov't's Mem. at 46);

- Defendant's February 9, 2021 arrest in Yonkers, New York, during which he made a recorded confession admitting "to possessing a kilogram of a substance that tested positive as cocaine," and a subsequent jailhouse call made to Harry where Defendant displayed "obvious sarcasm" in asking Harry "What you think I got caught with bro? Weed?" (*id.* at 47-48), followed by Defendant's call to Destiny Wade on February 14, 2021, during which he learned that Harry would provide him with a new phone after his release from Westchester DOC, (*id.* at 48);

- Ongoing calls between Sashery Feliz and Defendant, including one on April 24, 2021 in which Defendant texted asking Feliz the price of "the white" and Feliz responded that the price was "36" for "original fire." (*Id.* at 49.) Special Agent Penagos testified the price for a kilogram of cocaine between 2020 and present day was between $25,000 and $35,000, (*id.*);

- Evidence linking interactions with Feliz to other members of the conspiracy, such as speaking to Feliz about acquiring "the joint" on April 27, 2021 while at the Bloomfield residence with Harry preparing cocaine for distribution to "Wiz BK," and Defendant's call to Al Springfield, a cocaine distributor, telling him

12

that he was in Hartford and wanted him to "pull up on me" followed by telling Feliz he had "just grabbed something," (*id.* at 50);

- Chat communications between Wiz BK and Defendant on April 22, 2021 displaying a screenshot of a message stating "the 2 white girls I want to see if I can sell one full and break one," followed by an April 28, 2021 three-way call between Defendant, Brown, and "Wiz BK" to coordinate a delivery from Brown to Wiz BK in New York City. (*Id.* at 51.) Shortly after the delivery, Wiz BK called and complained that the weight of the delivery was only 900 grams, and later messaged that his product was "messed with," to which Defendant replied "u gave it to me stepped on" and Defendant "put it together" because he had "broke it down into 100's." (*Id.* at 51.) The cocaine Defendant possessed when he was arrested in Yonkers was a kilogram of cocaine "broken down" into ten 100-gram quantities, (*id*);

- A call on May 6, 2021 from Defendant to Al Springfield asking about purchasing cutting agent, followed by a trip to Springfield, MA to meet him, and a return trip to the vicinity of Harry's Bloomfield residence. After returning to the vicinity of the Bloomfield residence, Defendant called Shawanda Wakefield; during the call, chopping noises were audible, and Defendant said he was "cooking some. . . not no food, but something else,"[2] (*id.* at 52);

---

[2] Defendant argues that Wiley's statement is inadmissible because Wakefield was not within the scope of the conspiracy; however, any statement made by Defendant would be admissible as the statement of an opposing party. (Def.'s Reply [Doc. # 603] at 12.)

- A call on May 7, 2021 to an unknown individual in which Defendant said he had some "shit" that was "fire," and that he could sell him "a whole joint for 32K," (*id.* at 52-53);

- A call on May 7, 2021 which Defendant placed to Al Springfield to acquire more cut material, during which he said "my peoples is loaded with that shit," and that he was offered "Four for a buck. He was letting them shit go for a quarter." (*Id.* at 53.) When Defendant made this call, his phone was in the vicinity of Action Audio. (*Id.*);

- A conversation on May 7, 2021 between Defendant and Peter Munoz where Defendant said he had "white girl" available for sale, and Munoz said he had buyers looking to purchase 300 grams, (*id.* at 53);

- Over a kilogram of cocaine was seized from Harry's residence, (*id.* at 55);

- A call between Al Springfield and Defendant on May 28, 2021, in which Springfield said a client "wants me to grab ten of them at that, but I'm only grabbing two myself and my man was grabbing a couple of them shit," to which Defendant responded "Bro, if you can get ten for better than that, [n-word] then we gonna need to holla at you." (*Id.* at 57.)

According to the Defendant, the Government failed to show how a prison call between Defendant and Kenston Harry which "simply indicated Wiley telling Harry about his Yonkers arrest" and "established [Harry's] confusion and shock upon finding out that [the drug Defendant was arrested with] was cocaine" established a conspiracy between Defendant and Harry to possess with intent to distribute the cocaine seized in Defendant's Yonker's arrest. (Def.'s Acquit. Mem. at 10.) However, the Government urges the Court to examine the interaction in the broader context of Harry and Defendant's "drug trafficking relationship," including comments made during the call that Harry and Defendant were relieved that Harry

14

had not also made the trip "cause it would make no sense for two of us to be in here," Harry expressing concern about the possibility that the police might have a password to Defendant's phone, and Defendant's direction for Harry to get him a new phone and "avoid certain people" so they would not "switch up." (Gov't Mem. at 48.) Based on Defendant and Harry's involvement in a marijuana and crack cocaine conspiracy, which Defendant concedes, and the implications from the call that Harry was concerned about the substance Defendant had been caught with and the possibility of Defendant's phone being accessed by the police, a reasonable jury could infer that the cocaine seized in the Yonkers arrest was within the scope of the conspiracy.

Defendant also argues that with regard to the 900-gram delivery made to Wiz BK, there was no evidence establishing that the substance was cocaine. (Def.'s Acquit Mem. at 11-12.) The Government contends, however, that it supported an inference that the substance was cocaine by providing evidence that Defendant and Wiz BK "had a cocaine relationship, discussing 'white girl' in chat communications," and that the delivery took place "the day after Wiley discussed kilogram quantities of cocaine with Feliz." (Gov't Mem. at 51-52.) Special Agent Penagos also testified that cocaine was discussed in metric quantities by drug traffickers, and the Government contends that the reference to breaking the delivery "down into 100's" bore similarity to the way the kilogram found during Defendant's Yonkers arrest was packaged – a kilogram quantity broken down into ten 100-gram packages. (Gov't Mem. at 51-52.) Rather than impermissible speculation made in the "complete absence of probative facts to support the conclusion reached," *Lavender v. Kurn*, 327 U.S. 645, 653 (1946), the jury could have made a "reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact that is known to exist" and inferred that the substance delivered to Wiz BK was cocaine based on the fact that it was packaged similarly

to the cocaine recovered during Defendant's Yonkers arrest, the conversation with Feliz, and the metric quantities discussed. *Siewe v. Gonzales*, 480 F.3d 160, 168 (2d Cir. 2007).

As for the conversations between Feliz and Defendant, Defendant argues that "there is no other evidence linking this purported drug transaction to the defendant's conspiracy with Harry," and that it might instead have been part of Defendant's "many drug transactions with various individuals who had no connection to one another" that lacked a "nexus linking everyone together." (Def.'s Acquit Mot. at 11.) Defendant makes a similar argument regarding the May 7, 2021 interaction between Defendant and Munoz,[3] characterizing it as a "buyer-seller relationship" which "[w]ithout more" was insufficient to establish a conspiracy, especially when there was no way to identify the substance Defendant communicated with Al Springfield about in that same time period or determine whether it was related to the Munoz transaction. (Def.'s Mem. at 13.)

The Government argues that the evidence suggests that rather than being involved in a single drug transaction distinct from a conspiracy, the relationship between Defendant and Feliz was an "ongoing conspiratorial relationship pertaining to multiple controlled substances, including kilogram quantities of cocaine." (Gov't's Mem. at 49.) It also asserts that the call with Munoz does not meet the criteria for the buyer-seller exception because it "demonstrates Wiley and Munoz conspiring to distribute wholesale quantities of cocaine to Munoz's customers and does not evince that Munoz was seeking merely to purchase small quantities of controlled substances for personal use," especially in light of their "history of Munoz acting as a middleman for Wiley's cocaine trafficking." (Gov't's Mem. at 54-55.) This

---

[3] Defendant also argues that the communications between Defendant and Watson cannot be used to prove a cocaine conspiracy, because Watson was acquitted of the cocaine conspiracy. However, the Government does not contend that the specific communications and drug weight that it tried to attribute to the Defendant/Watson communications are needed to uphold Defendant's conviction.

history included a call in which Defendant stated "I have some more of that other stuff, the white[;]" when Defendant asked how much Munoz's customer would buy, Munoz replied that "[h]e buy a lot, man." (Gov't Mem. at 55.)

"The rationale for holding a buyer and a seller not to be conspirators is that in the typical buy-sell scenario, which involves a casual sale of small quantities of drugs, there is no evidence that the parties were aware of, or agreed to participate in, a larger conspiracy." *United States v. Medina*, 944 F.2d 60, 65 (2d Cir. 1991). The existing relationship between Munoz and Defendant would allow a jury to draw an inference that the two were not casually dealing in small quantities for personal use, as required to establish a buyer-seller relationship exception, but instead in large volume quantities intended for distribution. *See Wise,* 2019 WL 988452 at *3 (declining to find that the transaction was a mere buyer-seller relationship based on the volume of drugs being sold.) Thus, the jury could properly consider the 300 grams that Defendant sought to have Munoz distribute to his customers as part of the conspiracy. Likewise, the call between Defendant and Feliz was not introduced in isolation, but rather against a backdrop that evidenced a prior relationship, such as a message in which Feliz told Defendant she would negotiate better prices for him ("33" for a "joint"). (Gov't Mem. at 49.) A reasonable jury could find that negotiating prices and dealing in kilogram quantities were indicative of Feliz's participation in a conspiracy, rather than a relationship limited to a single transaction.

The jury need only have credited the Government's arguments for one or two of these interactions to find that Defendant conspired with intent to distribute 500 grams or more of cocaine. It could have found that the kilogram of cocaine[4] seized in the Yonkers arrest was

---

[4] While only 400 grams of the substance recovered in the Yonkers arrest was tested and confirmed to be cocaine, a reasonable jury could have inferred based on that fact that the remaining amount of white powder seized from the same location, packaged in the same way, was also cocaine based on Defendant's confession at the time that he possessed a

part of the Defendant/Harry conspiracy, that the conversation between Defendant and Feliz discussing selling the "white" for "36" referred to a kilogram of cocaine, that the 900 grams of illicit substance delivered to Wiz BK in New York City was cocaine, or that the conversations with the unknown number and with Munoz on May 7, 2021 discussing selling a "joint" of "fire" or "white girl" involved the sale of a kilogram and 300 grams of cocaine, respectively; jurors may also have considered the evidence in the aggregate in determining that the total amount exceeded 500 grams. *See United States v. Whyte*, No. 3:19-CR-00064 (VAB), 2022 WL 4120779, at *10 (D. Conn. Sept. 9, 2022)(considering both the known amounts of a particular substance involved in the scope of conspiracy and unknown amounts from trips and interactions where the substance could not be recovered, weighed, and tested in determining whether the threshold amount for conviction was proven in light of all the evidence presented). To acquit the Defendant on this count, however, the Court would need to find it unreasonable for the jury to credit *any* of these transactions as involving cocaine, or as being part of a conspiracy between Defendant and another individual. Based the evidence detailed above. there is no reason for the Court do so. [5]

---

kilogram of cocaine. (Def.'s Acquit. Mem. at 10); *see United States v. Adames*, 727 F. App'x 12, 13–14 (2d Cir. 2018)(finding it proper to find the defendant liable for 5 kilograms of a controlled substance if the four packages that were seized and tested totaled roughly four kilograms, and there were nine packages in total).

[5] In addition to his specific attacks on the sufficiency of the evidence regarding each substance involved in the conspiracy, Defendant also mounts a broadside attack on the Government's case regarding the conspiracy as a whole. He argues that the circumstances of the Government's investigation, the lack of "direct evidence" such as testimony of co-conspirators, controlled buys, or footage tying him to Harry's residence, suggest "evidentiary deficiencies" in the Government's case that it sought to supplement with "speculation and conjecture" from Special Agent Penagos on the meaning of various drug terms. (Def.'s Reply at 2-3.) However, the fact that individual witnesses could not provide the full picture, such as Hoffman providing no evidence corroborating the conspiracy "aside from the phone communications," Agent Hauger's testimony that Defendant's phone connected to cell towers near areas but that he could not place Defendant at a "precise location," or the

### 3.     Sufficiency of the Evidence of Possession with Intent to Distribute Cocaine Base

Possession with intent to distribute has three elements: "(1) the Defendant[] possessed the controlled substance described in the indictment; (2) the Defendant[] possessed the controlled substance with the intent to distribute it; and (3) the Defendant[] did so knowingly and willfully." *United States v. VanHoesen*, 578 F. Supp. 2d 449, 452 (N.D.N.Y. 2008), *aff'd*, 366 F. App'x 264 (2d Cir. 2010).

 Defendant argues that the Government failed to prove beyond a reasonable doubt that Defendant possessed with intent to distribute cocaine base, or "crack." During Defendant's arrest on June 8, 2021, a substance was found in his car that was later determined to be 83.4 grams of cocaine base. (Def.'s Acquit. Mem. at 14.) According to Defendant, the quantity of the crack cocaine was not enough to establish that there was an intent to distribute, even when viewed in light of prior communications between Defendant and his uncle, Charles Richardson, regarding crack cocaine. (*Id.*) The Government notes as an initial matter that at closing argument, Defendant's counsel said he was "guilty [of] count four" (the corresponding count) and that Defendant "possessed crack cocaine – possessed it with intent to distribute." (Gov't's Mem. at 58.) Even setting aside counsel's comments, however, the Government argues that phone communications from May 8, 2021, in which Richardson asked for an "eight ball" and said "[t]he guy waiting and he want an eight ball bro…" (*Id.* at 58.) Defendant confirmed that he was coming after he "cook[ed]" it. (*Id.*) Special

---

Yonkers detective testifying to the quality of cocaine he possessed but "nothing relative to the conspiracy charge," ignores the fact that the Government's case is not to be examined by taking each piece of evidence in isolation, but as a mosaic forming a bigger picture. (*See* Def.'s Reply.) When taken together, the Government's evidence established both a conspiracy to possess with intent to distribute an unspecified amount of fentanyl and over 500 grams of cocaine.

Agent Penagos further testified that an "eight ball" is a term referencing about three grams, an amount Defendant characterizes as a "quantity attributed to personal use." (*Id.*; Def.'s Acquit. Mem. at 14.)

Based on the conversations with Richardson alone, the jury could find that Defendant possessed the crack cocaine that he was "cooking" for Richardson with an intent to distribute it to a customer that was "waiting" for an "eight ball." The fact that the specific crack cocaine involved in that transaction was not recovered or submitted into evidence is not dispositive; "there is no requirement that the defendant be observed in physical contact with narcotics in order to be convicted of its possession." *VanHoesen*, 578 F. Supp. at 452. The jury could also have separately determined that the 83.4 grams of crack cocaine found in Defendant's car satisfied the required elements. Constructive possession of the crack cocaine can be inferred based on its presence in Defendant's car at the time he was arrested; Defendant correctly points out that the jury was instructed that "possession of a large quantity of narcotics does not necessarily mean that the defendant intended to distribute them," (Def.'s Acquit. Mem. at 14), but intent to distribute "may be inferred from such things as the possession of a large quantity of a controlled substance." *VanHoesen,* 578 F. Supp. at 452. An eight ball, which the parties agree would be an amount consistent with personal use, is three grams. Defendant was apprehended possessing an amount that was nearly 28 times that, which alone permits a jury to reasonably infer intent to distribute.

## II.   Conclusion

The Court denies the Motion to Acquit [Doc. # 493] and the motion for a new trial [Doc. 3 492].

IT IS SO ORDERED.

_____/s/_____

Janet Bond Arterton, U.S.D.J.

20

Dated at New Haven, Connecticut this 16th day of December 2022.